Before the Court are cross-motions for summary judgment filed by Plaintiff and Counter-Defendant Scottsdale Insurance Company ("Scottsdale") and Defendants and Counter-Plaintiffs Certain Underwriters at Lloyds, London, including Brit UW Limited for and on behalf of Lloyds Syndicate 2987 ("Brit"), Beazley Furlonge Ltd. for and on behalf of Lloyds Syndicates 2623 and 0623 ("Beazley"), Faraday Capital Limited for and on behalf of Lloyd's Syndicate 0435 ("Faraday"), Amlin Underwriting Limited for and on behalf of Lloyd's Syndicate 2001 ("Amlin"), Renaissance Re Group for and on behalf of Lloyd's Syndicate 1458 ("Renaissance"), Lexington Insurance Company ("Lexington"), and Swiss Re International SE - Zurich ("Swiss Re" and, collectively with Brit, Beazley, Faraday, Amlin, Renaissance, and Lexington, "Underwriters"). See Dkts. 76, 90. For the reasons set forth below, Scottsdale's motion is GRANTED in part and DENIED in part, and Underwriters'
*804 motion is GRANTED in part and DENIED in part.
I. Factual Background
A. The Malpractice Insurance Policies
Defendant and Cross-Claimant Dickstein Shapiro LLP ("Dickstein") was a law firm and maintained malpractice insurance policies. Defendant Underwriters' Statement of Uncontroverted Facts and Conclusions of Law, Dkt. 118-1 ("DSUF"), ¶ 1. Underwriters issued a Primary Claims Made and Reported Lawyers Professional Liability Insurance policy to Dickstein identified as Policy No. B0621PDIC00212 (the "Primary Policy") for the period from December 20, 2012 to December 20, 2013 (the "Policy Period"). Id. ¶¶ 1-2; see also Dkt. 80-1.
The Primary Policy provides coverage to an "Assured" for claims first made against the Assured and reported to Underwriters during the Policy Period, for all claims "arising out of any act, error or omission of the Assured ... in rendering or failing to render professional services for others arising out of the conduct of the Assureds [sic] profession as lawyer, mediator, arbitrator, fiduciary, notary public or lobbyist." Dkt. 80-1 at 5. The Primary Policy also states that Underwriters "shall have the right and duty to defend, subject to the Limits of Liability, any Claim against the Assured seeking Damages which are payable under the terms of this Insurance [policy], even if any of the allegations of the Claim are groundless, false or fraudulent." Id. The Primary Policy defines the term "Assured" to include any lawyer who provided legal services as a partner for Dickstein. See id. at 6. The Primary Policy carried a policy limit of $15 million, with the various Underwriters insurers agreeing to cover a certain percentage of the policy limit. DSUF ¶ 2; see also Dkt. 80-1 at 1.
Dickstein also carried excess layers of malpractice insurance. Underwriters issued the First Excess Lawyers Professional Liability Insurance policy identified as Policy No. B0621PDIC00312 (the "Underwriters First Excess Policy") for the same Policy Period as the Primary Policy and embodying substantively similar defense and indemnity coverage. DSUF ¶ 3; see also Dkt. 80-2. Scottsdale, via its managing agent Huntersure LLC ("Huntersure"), also subscribed to a first layer excess policy with identical terms as the Underwriters First Excess Policy through a separate policy issued to Dickstein with the reference number LXS0000261 and identified as Policy No. B0621PDIC00312001 (the "Scottsdale First Excess Policy" and, together with the Underwriters First Excess Policy, the "First Excess Policy"). See Dkt. 80-3.
The First Excess Policy states that "[l]iability to pay under this Policy shall not attach unless and until the Underwriters of the [Primary Policy] shall have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses." Dkt. 80-2 at 5; Dkt. 80-3 at 8. The First Excess Policy carried a combined policy limit of $15 million above the $15 million limit provided by the Primary Policy. DSUF ¶ 5; see also Dkt. 80-2 at 2; Dkt. 80-3 at 5. Underwriters were allocated 70.62% of the First Excess Policy limit, and Scottsdale agreed to cover the remaining 29.38% share. DSUF ¶ 6; see also Dkt. 80-2 at 1; Dkt. 80-3 at 2-4. Each insurer's subscription to the Primary Policy and/or the First Excess Policy can be summarized as follows:
*805 First Excess Primary Layer Participants Policy Policies Brit (2987) 22.58% 5.87% Beazley (2623/623) 22.58% 14.69% Lexington 9.03% 4.41% Faraday (435) 6.78% 5.87% Amlin (2001) 4.51% 5.87% RenRe (1458) 4.52% 3.91% Swiss Re 30.00% 30.00% Huntersure [Scottsdale] 0.00% 29.38% _______ _______ 100.00% 100.00%
Declaration of Marie Hill, Dkt. 118-2 ("Hill Decl."), ¶ 7.
B. The Hettrick Malpractice Action and Underwriters' Denial of Coverage
Clyde Hettrick was a partner at Dickstein, falling within the definition of an "Assured" under the Primary Policy. Scottsdale Insurance Company's Statement of Uncontroverted Facts and Conclusions of Law, Dkt. 116-1 ("PSUF"), ¶¶ 1, 9. In early 2008, Hettrick represented Manhattan Beachwear, LLC ("MBW") regarding insurance-related matters. Id. ¶ 2. In June 2008, Hettrick left Dickstein to start his own law firm, HettrickLaw P.C. ("HettrickLaw"). Id. ¶ 3. Hettrick continued representing MBW at HettrickLaw, and in January 2009 HettrickLaw filed a lawsuit on behalf of MBW against Lloyd's of London Insurers relating to certain insurance claims submitted by MBW (the "Lloyd's Litigation"). Id.
In 2011, MBW fired HettrickLaw as counsel for the Lloyd's Litigation and retained Dickstein as replacement counsel for the duration of the Lloyd's Litigation. Id. ¶ 4. In late 2012, the parties settled the Lloyd's Litigation. Id. MBW refused to pay fees to HettrickLaw and Dickstein related to the Lloyd's Litigation, threatening to file a malpractice action against Hettrick if Hettrick attempted to collect fees from MBW. Id. ¶ 5. MBW entered into a tolling agreement with Hettrick and HettrickLaw on June 13, 2012 regarding HettrickLaw's claim for fees against MBW, with an expiration date for the tolling agreement set as December 15, 2012. Id. ¶ 6.
On December 14, 2012, MBW filed a malpractice lawsuit against Hettrick and HettrickLaw in the Superior Court for the State of California, captioned Manhattan Beachwear, LLC v. Hettrick Law, P.C. et al. , Case No. BC497520 (Cal. Super. Ct.) (the "Hettrick Malpractice Action"). PSUF ¶ 7; see also Dkt. 93-1. MBW alleged damages exceeding $11 million as a result of Hettrick's professional negligence in tendering MBW's insurance claims and in handling the Lloyd's Litigation. PSUF ¶ 8; Dkt. 93-1 ¶¶ 14-17. In February 2013, Hettrick's attorney notified Dickstein that Hettrick was sued on a matter that originated while Hettrick was a partner at Dickstein. PSUF ¶ 10; Dkts. 93-10-11. In an email on March 13, 2013, before Hettrick had been served with the complaint for the Hettrick Malpractice Action, counsel for Hettrick formally requested that *806 Dickstein and Dickstein's insurers participate in defending the Hettrick Malpractice Action. PSUF ¶¶ 11-12; Dkt. 93-12. After not hearing back from Dickstein for two months, on May 8, 2013, counsel for Hettrick repeated the request that Dickstein participate in the defense of the Hettrick Malpractice Action. PSUF ¶ 13; Dkt. 93-12.
On May 14, 2013, Dickstein sent a letter to Underwriters, providing Underwriters with a "Notice of Circumstance" regarding the Hettrick Malpractice Action. Dkt. 93-13. The following day, counsel for Underwriters, Furman Kornfeld & Brennan LLP ("FKB"), acknowledged receipt of the Notice of Circumstance on behalf of Underwriters, referencing only the identification number for the Primary Policy. Dkt. 116-2.
In July 2013, FKB prepared a draft report to Underwriters containing a draft of a letter responding to Dickstein's Notice of Circumstance. See Dkts. 116-23-25. The draft letter to Dickstein prepared by FKB suggested that Underwriters should deny defense and indemnity coverage to both Hettrick and Dickstein on account of Hettrick's alleged late notice of the Hettrick Malpractice Action per the terms of the Primary Policy. Dkt. 116-24 at 6-7. After receiving the draft letter and report from FKB, Dickstein's broker responded to FKB by expressing concern about the validity of a denial of coverage to Hettrick and Dickstein based on the terms of the Primary Policy. See Dkt. 116-3. FKB responded by clarifying that the issue addressed in FKB's report was limited to whether coverage should be afforded to Hettrick individually, since Dickstein was not a named defendant in the Hettrick Malpractice Action, and "should a direct claim be brought against Dickstein that coverage would be afforded." Id. at 1.
On August 1, 2013, FKB sent a letter to Dickstein's broker denying coverage for the Hettrick Malpractice Action under the Primary Policy, stating that Underwriters "will not defend or indemnify Mr. Hettrick" in connection with the Hettrick Malpractice Action. Dkt. 93-15 at 7. The letter denying coverage did not mention Scottsdale or the First Excess Policy.
On October 15, 2013, Hettrick passed away following a surfing accident. PSUF ¶ 30; see Dkt. 116-5. In a letter dated October 22, 2013, FKB recommended to Dickstein's broker that the insurance file for the Hettrick Malpractice Action be closed in light of Hettrick's death. See Dkt. 116-6.
C. Resolution of the Hettrick Malpractice Action
On April 23, 2015, MBW entered into a settlement agreement with Hettrick's estate (the "Estate") and HettrickLaw regarding the Hettrick Malpractice Action (the "Hettrick Settlement"). PSUF ¶ 32; see Dkt. 93-6. The Recitals page of the Hettrick Settlement stated that, following Underwriters' denial of coverage for the Hettrick Malpractice Action under the Primary Policy, the Estate was faced with substantial financial burdens in defending the Hettrick Malpractice Action, even though HettrickLaw was defended by its malpractice insurer, Hanover Insurance Company/Professional Direct Insurance Company ("Hanover"), under a reservation of rights. Dkt. 93-6 at 1-2.
In the Hettrick Settlement, MBW agreed to dismiss HettrickLaw from the Hettrick Malpractice Action with prejudice and to substitute the Estate and the Estate's personal representative as the defendant in the action. Id. at 3. The Estate agreed to allow the Hettrick Malpractice Action to proceed to an "uncontested prove-up hearing" on liability and damages, in which the court would consider all necessary and relevant evidence presented *807 by MBW, and the Estate would not contest the nature or amount of claims made by MBW against the Estate. Id. at 3-4. The court would then enter a final judgment against the Estate in the Hettrick Malpractice Action. Id. at 4. In exchange, MBW agreed to a covenant not to execute the final judgment against the Estate, and the Estate assigned any and all of its potential assignable claims against Underwriters regarding the denial of coverage for the Hettrick Malpractice Action, including breach of contract and insurance bad faith, to MBW or MBW's designated assignee. Id.
Following the execution of the Hettrick Settlement, the Hettrick Malpractice Action proceeded to an uncontested trial. PSUF ¶ 34. On August 10, 2015, the court in the Hettrick Malpractice Action entered judgment against the Estate for $63,888,486.49. Id. ; see Dkt. 93-4. At the same time, the court issued a Statement of Decision apportioning the final judgment as follows: (1) $91,764,841.38 due to the failure of MBW's insurer to pay claims submitted in July 2007; (2) $4,919,604.43 attributable to unnecessary attorney's fees and costs; (3) $228,217.57 in corporate travel costs; (4) 19,840.65 in witness travel costs; (5) $93,812.05 in claim preparation costs not reimbursed; and (6) consequential damages in the amount of $48,862,475.60 due to a delay in MBW's acquisition of a company called Apparel Ventures as a result of Hettrick's alleged malpractice regarding MBW's insurance claims. PSUF ¶ 35; see Dkt. 93-5 at 6-8.
D. The SFA Action and Settlement
After the uncontested trial and judgment in the Hettrick Malpractice Action, FKB reopened the insurance file on behalf of Underwriters for the Hettrick Malpractice Action. PSUF ¶ 36. On January 1, 2016, MBW assigned the judgment in the Hettrick Malpractice Action and MBW's rights under the Primary Policy and First Excess Policy to SFA Group, LLC ("SFA"). Id. ¶ 37; see Dkt. 78-3 at 28-35.[1] Subsequently, on December 7, 2016, SFA filed a lawsuit against Underwriters in California state court, captioned SFA Group, LLC v. Certain Underwriters at Lloyd's, London et al. , Case No. BC618980 (Cal. Super. Ct.) (the "SFA Action"). PSUF ¶ 38; see Dkt. 93-7.
In the SFA Action, SFA brought claims against Underwriters and Scottsdale[2] under both the Primary Policy and the First Excess Policy for breach of the insurance contract and breach of the implied covenant of good faith and fair dealing, due to Underwriters' denial of coverage and refusal to defend or indemnify Hettrick in connection with the Hettrick Malpractice Action. See Dkt. 93-7 ¶¶ 44-71. SFA sought recovery of the judgment in the Hettrick Malpractice Action as the consequential damages of Underwriters' failure to defend Hettrick, pursued punitive damages against Underwriters under the insurance *808 bad faith claim, and also requested attorney's fees and costs in the action. See id. at 15-16. The complaint in the SFA Action did not specify which claims SFA brought under the Primary Policy-pertaining to Underwriters only-and which claims also sought recovery under the First Excess Policy-pertaining both to Underwriters and Scottsdale.
In August 2017, SFA and Underwriters engaged in mediation to resolve the SFA Action. PSUF ¶ 41. Dickstein was not provided notice of the mediation and did not participate, since Dickstein was not a named defendant in the SFA Action. See Dkt. 104 at 8 (Dickstein's brief in opposition to Scottsdale's motion for summary judgment representing as much). At the mediation, Brit negotiated on behalf of the Primary Policy insurers as the lead underwriter for that policy, while Beazley negotiated as lead underwriter on behalf of the First Excess Policy insurers. See Declaration of Frederick Marsh, Dkt. 118-7 ("Marsh Decl."), ¶ 10; see also Hill Decl. ¶ 11. Scottsdale evidently attended the mediation as a passive observer but refused to contribute to any settlement sum reached by the parties. See Dkt. 106-6 at 157:19-160-5 (deposition of Paul Sewell with Huntersure regarding Scottsdale's involvement during the mediation).
Ultimately, in the mediation SFA and Underwriters reached an agreement in the form of a settlement term sheet signed and dated on August 17, 2017 (the "Term Sheet"). See Dkt. 116-14. In the Term Sheet, SFA agreed "to a complete, full, and final release by SFA of all known and unknown claims related to the denial of insurance to Clyde Hettrick, III for the malpractice claims against him presented by [MBW]," a release which would cover "all claims and damages of any kind, character, or descriptions of any kind whatsoever against UNDERWRITERS and to be identified other insurers of Dickstein Shapiro LLP." Id. at 1. Following execution of a binding settlement agreement, the Term Sheet provided that "[a]ll litigations, arbitrations, and adjudications between SFA or MBW and any released party shall be dismissed with prejudice." Id.
In exchange for SFA's release of claims, Underwriters agreed in the Term Sheet to pay $17,500,000 to SFA. Id. SFA was "entitled to allocate the settlement amount to damages for the delayed acquisition of Apparel Ventures," with SFA shouldering all tax issues and responsibilities arising from the allocation. Id. The Term Sheet further acknowledged that Underwriters "may and will seek contribution towards this settlement amount from other parties and/or allocation among UNDERWRITERS," necessitating that Underwriters meet to determine how to allocate the settlement amount across each individual insurer within Underwriters and how to allocate the settlement across the Primary Policy and the First Excess Policy. Id. To allow for an allocation meeting, the Term Sheet was kept open until September 18, 2017 without revocability, and if Underwriters did not accept the settlement terms prior to that date, the Term Sheet would become null and void. Id. at 1-2. Scottsdale was not a signatory to the Term Sheet.
E. The Allocation Negotiations
On August 18, 2017, the day after signing the Term Sheet, Aidan McCormack, counsel for Underwriters, notified his clients of the Term Sheet and encouraged Underwriters to negotiate an allocation of the $17.5 million settlement amount so that the settlement of the SFA action could be finalized. See Dkt. 118-8. Mr. McCormack informed Underwriters that he and his firm "cannot be involved in allocation discussions among you," leaving the individual Underwriters insurers to negotiate *809 amongst themselves. Id. Notably, Paul Sewell with Huntersure was included on the email as Scottsdale's representative. See id.
Underwriters then initiated negotiation efforts amongst the insurers to allocate the SFA settlement amount. See Hill Decl. ¶ 15. The negotiations initially focused on the question of whether, and to what extent, any of the SFA settlement amount should be allocated toward "extra-contractual obligations" (also referred to as "ECO" exposure) for Underwriters' alleged breach of the covenant of good faith and fair dealing in denying defense coverage to Hettrick in the Hettrick Malpractice Action, which was one of the claims asserted by SFA against Underwriters. See id. Any amount designated as ECO exposure would be borne solely by the subscribers to the Primary Policy above and beyond each subscriber's respective policy limit under the Primary Policy, on the ground that the Primary Policy insurers were solely responsible for the denial of coverage to Hettrick for the Hettrick Malpractice Action. The portion of the SFA settlement designated as ECO exposure would correlate to a reduction in the amount of the SFA settlement allocated to the insurance policies, consequently reducing the required contribution from the subscribers to the affected level of insurance by the amount of ECO exposure.
Brit, the lead underwriter for the Primary Policy, first proposed that all of the SFA settlement amount should be applied toward the Primary Policy and First Excess Policy limits. Id. ¶ 16. Apportionment across the two policies would be accomplished by (1) accounting for any prior erosion of the Primary Policy, (2) requiring the subscribers of the Primary Policy to pay the remainder of the Primary Policy limit according to each subscriber's respective share to satisfy a portion of the SFA settlement, and (3) allocating the remainder of the SFA settlement to the First Excess Policies per each subscriber's respective share. Id. Under Brit's proposal, none of the settlement amount would be allocated toward ECO exposure to account for Underwriters' alleged bad faith denial of defense coverage to Hettrick. Id.
Beazley, the lead underwriter under the First Excess Policy, countered Brit's proposal by arguing that up to one third of the $17.5 million settlement should be allocated to ECO exposure on the part of the Primary Policy insurers for their bad faith failure to defend, thereby requiring each subscriber to the Primary Policy to pay its respective share of ECO exposure above its Primary Policy limit. Id. ¶ 18; Marsh Decl. ¶ 15. Beazley's allocation would have required the subscribers to the Primary Policy to pay all of the $17.5 million settlement amount, without any amount allocated to the First Excess Policy. Marsh Decl. ¶ 15. Because of the disagreement between Underwriters regarding the allocation across the Primary Policy and First Excess Policy, Mr. McCormack negotiated an extension of the Term Sheet with SFA to allow Underwriters to continue their allocation negotiation efforts. Hill Decl. ¶ 20.
During the allocation negotiations, Underwriters also attempted to coordinate with Scottsdale to have Scottsdale contribute to the SFA settlement amount as a First Excess Policy subscriber. Freddie Marsh, Beazley's representative acting on behalf of Underwriters in their capacity as First Excess Policy insurers, emailed Mr. Sewell on September 12, 2017, requesting Scottsdale's formal position on whether Scottsdale would agree to an allocation of a portion of the SFA settlement to the First Excess Policy limits. See Dkt. 118-9 at 3. The next day, on September 13, 2017, Mr. Sewell responded to Mr. Marsh, stating that "Scottsdale will not be making any *810 contribution to the $17.5M settlement." Id. at 1. Scottsdale took the position that the SFA settlement "was in relation to [SFA's] claim [against Underwriters] for bad faith for the erroneous denial of coverage and the failure to defend the insured Lawyer in an underlying legal malpractice action." Id. Scottsdale argued that had a defense been provided to Hettrick, the Hettrick Malpractice Action "would not have cost anywhere near the [Primary Policy] limit." Id.
In light of Scottsdale's representations that it would not contribute to the SFA settlement, Underwriters continued to negotiate amongst themselves and held a market meeting on November 14, 2017. Hill Decl. ¶ 21. The day before the market meeting, on November 13, 2017, Scottsdale sent a letter to Underwriters reaffirming Scottsdale's refusal to contribute to the SFA settlement, arguing that "the entirety of the $17.5 million [settlement] was paid because of [Underwriters'] bad faith denial of a defense." See Dkt. 118-10. Beazley, representing the interests of the Underwriters subscribers to the First Excess Policy, responded to Scottsdale and informed Scottsdale of the market meeting, noting that "Beazley as the second agreement party on the [Primary Policy] and the lead of the first excess layer, have called into question the allocation strategy of the primary lead." Dkt. 118-11 at 2. Mr. Sewell testified at his deposition that, despite having notice of the market meeting from Beazley, Scottsdale was not affirmatively invited to the market meeting, although neither was Scottsdale "disinvited" from attending. See Dkt. 116-19 at 170:3-9, 171:6-12. In response to Scottsdale's letter, Beazley also disagreed with Scottsdale's characterization that all of the SFA settlement should be considered ECO exposure, noting that while there is "huge debate" over the proper amount of ECO exposure that should be incorporated in the SFA settlement allocation, "zero is clearly not reflective of the real extracontractual exposure, nor was it over 50%." Dkt. 118-11 at 1. Ultimately, Scottsdale did not attend the market meeting, and neither did Dickstein. See Marsh Decl. ¶ 17; Dkt. 104 at 8.
At the market meeting, Underwriters negotiated the amount of the SFA settlement that should be designated as ECO exposure. Hill Decl. ¶ 21; Marsh Decl. ¶ 19. Without Scottsdale's contribution to the SFA settlement, at the market meeting Underwriters also had to resolve the issue of how Underwriters would account for Scottsdale's gap in contribution to the SFA settlement for any amount of the settlement allocated to the First Excess Policy. Hill Decl. ¶ 19. Ultimately, Underwriters reached a compromise regarding the allocation of the SFA settlement. Hill Decl. ¶ 21; Marsh Decl. ¶ 19. Per the compromise, the settlement amount would first be allocated to exhaust the Primary Policy limit, which at that time had been subject to an unconfirmed amount of prior erosion from unrelated claims. Hill Decl. ¶ 21; Marsh Decl. ¶ 19. Then, the additional amount of the SFA settlement not allocated to the Primary Policy would be paid by the subscribers to the First Excess Policy, absent Scottsdale's 29.38% share of the First Excess Policy. Hill Decl. ¶ 21; Marsh Decl. ¶ 19. Scottsdale's unaccounted share would then be paid pro rata by each remaining subscriber of both the Primary Policy and First Excess Policy-i.e. , Underwriters-with any amount paid by the Primary Policy subscribers considered to be ECO exposure as paid above the Primary Policy limits. Hill Decl. ¶ 21; Marsh Decl. ¶ 19.
In early December 2017, Beazley prepared a spreadsheet to calculate the contributions due from each subscriber to the Primary Policy and First Excess Policy pursuant to the terms of the compromise *811 at the market meeting (the "Allocation Sheet"). Marsh Decl. ¶ 21; Dkt. 118-5 at 66. Underwriters confirmed the amount of prior erosion under the Primary Policy as $3,258,007, leaving the remaining balance of the Primary Policy as $11,741,993. Dkt. 118-5 at 66. Under the Allocation Sheet, the subscribers to the Primary Policy agreed to pay a total of $12,998,546 toward the SFA settlement. Id. Thus, when subtracting the remaining balance of the Primary Policy from the amount paid by the Primary Policy insurers, the Primary Policy insurers contributed $1,256,553 above the Primary Policy limits, or approximately 7.18% of the value of the SFA settlement, as ECO exposure. Hill Decl. ¶ 22; Marsh Decl. ¶ 21. Per the Allocation Sheet, the First Excess Policy insurers-excluding Scottsdale-agreed to pay the remaining $4,501,454 of the SFA settlement as indemnity under the First Excess Policy. Dkt. 118-5 at 66. Scottsdale's attributed share of the First Excess Policy erosion was $1,691,702, an amount which was allocated pro rata both to subscribers to the Primary Policy (as the ECO exposure) and to the other subscribers to the First Excess Policy (for which the Underwriters subscribers to the First Excess Policy seek equitable contribution from Scottsdale in this action). Dkt. 118-5 at 66. Scottsdale disputes the characterization of any excess amounts paid by the Primary Policy insurers per this compromise as allocated toward ECO exposure, arguing that it was a simple "exercise in math" to account for the gap in funding created by Scottsdale's refusal to contribute and pointing to the absence of any affirmative representations by Underwriters as to the allocation between "covered" claims under the Primary Policy and First Excess Polity and "non-covered" claims of bad faith failure to defend. See Dkt. 138 at 22; see also Dkt. 116-16 (email from Marie Hill explaining that Underwriters "all agreed to increase our contributions" to "address the shortfall" resulting from Scottsdale's refusal to contribute).
After agreeing to the Allocation Sheet, Underwriters and SFA entered into a Confidential Settlement Agreement and General Release, fully executed on December 7, 2017 (the "SFA Settlement Agreement"). See Dkt. 118-4. The SFA Settlement Agreement reaffirmed the tentative settlement terms in the Term Sheet, providing that SFA releases all claims assigned to SFA against Underwriters, including the bad faith claims, in connection with the denial of coverage to Hettrick in the Hettrick Malpractice Action. Id. at 5-6. SFA also agreed to dismiss all legal proceedings between SFA and Underwriters related to the Hettrick Malpractice Action with prejudice. Id. at 5. SFA maintained the right to allocate the $17.5 million settlement amount "in any manner as SFA chooses, including in whole or part to damages for delay in a certain acquisition of Apparel Ventures by MBW." Id. SFA subsequently dismissed the SFA Action with prejudice against both Underwriters and Scottsdale, even though SFA did not release any claims against Scottsdale since Scottsdale was not a party to the SFA Settlement Agreement. DSUF ¶ 27. Dickstein was also not a party to the SFA Settlement Agreement, and Dickstein did not receive any release of claims as part of the SFA Settlement Agreement. Dkt. 104 at 8. Dickstein further represents that it was not asked, and did not provide, authorization to Underwriters for any settlement of the SFA Action as a result of the mediation. See id.
F. Procedural History
Scottsdale initiated the instant action on April 6, 2018, asserting claims for declaratory relief against Underwriters and Dickstein. See Dkt. 1. Scottsdale filed a First *812 Amended Complaint on April 11, 2018. See Dkt. 14 (the "FAC"). In the FAC, Scottsdale seeks a declaratory judgment that the amount paid by Underwriters under the SFA Settlement Agreement did not erode the limits of the Primary Policy, and therefore that Scottsdale has no obligation to reimburse Underwriters for any portion of the SFA Settlement Agreement. Id. ¶ 50. Scottsdale also seeks a declaratory judgment that, because the Primary Policy has not been exhausted, the Primary Policy remains liable for any future claims or expenses tendered by Dickstein, and that the First Excess Policy is not liable to provide coverage for any other actions against Dickstein until the Primary Policy is fully exhausted. Id. ¶ 58.
On June 14, 2018, Dickstein filed an Answer to the FAC, asserting counterclaims against Scottsdale and cross-claims against Underwriters seeking declaratory relief that Dickstein has satisfied all of its obligations as an insured under the Primary Policy and First Excess Policy. See Dkt. 38-1 at 15-16. Dickstein also sought a determination of the parties' respective rights under the Primary Policy and First Excess Policy so that Dickstein can be afforded full insurance coverage in any future actions against Dickstein falling within the terms of the insurance policies. Id. at 18-19. Specifically, in June 2017, an action was initiated against Dickstein in the Supreme Court of the State of New York, identified as Kevin R. McCarthy, as Chapter 7 Bankruptcy Trustee for Charles Taylor Muhs v. Dickstein Shapiro LLP & Neal S. Barlia , Index No. 58535/2017 (the "Muhs Action"). See Dkt. 38-1 at 16. Dickstein provided notice of the Muhs Action to Underwriters and sought coverage under the Primary Policy, and Underwriters has provided a defense of Dickstein in the Muhs Action under the First Excess Policy. Id. In light of Scottsdale's position in this action that the Primary Policy has not been eroded by the SFA Settlement Agreement, Scottsdale allegedly has failed to tender its share of defense costs under the First Excess Policy to Dickstein. Id. at 17-18.
On September 12, 2018, Underwriters filed an Answer to the FAC, bringing a counter-claim against Scottsdale for equitable contribution in connection with the SFA Settlement Agreement and defense of the Muhs Action. Dkt. 54 ¶¶ 71-73. Underwriters allege that Scottsdale is obligated to pay 29.38% of all amounts paid by Underwriters under the First Excess Policy. Id. ¶ 72.
It is noteworthy that, on November 15, 2018, Underwriters filed a separate lawsuit against FKB in the Supreme Court of the State of New York, identified as Lloyd's Syndicate 2987 et al. v. Furman Kornfeld & Brennan, LLP & Andrew Jones , Case No. 160612/2018 (the "FKB Action"). PSUF ¶ 52; see Dkt. 93-8. In the FKB Action, Underwriters allege that FKB committed legal malpractice by failing to properly investigate Hettrick's claim for insurance coverage related to the Hettrick Malpractice Action, failing to inform Underwriters of all material issues related to Hettrick's claim for coverage, providing erroneous recommendations to Underwriters regarding Hettrick's claim for coverage, and failing to assert certain coverage defenses. Dkt. 93-8 ¶ 1. In Underwriters' complaint in the FKB Action, Underwriters acknowledged that its position in the SFA Action was "severely prejudiced" due to FKB's allegedly erroneous legal advice and further conceded that "[t]he amount paid by the Underwriters to litigate and resolve the [SFA Action] was significantly more than the amount that the Underwriters would have paid if it participated in the defense and resolution of the Hettrick Malpractice Action." Id. ¶¶ 28, 30. Underwriters sought to recover damages from *813 FKB as a direct and proximate result of FKB's malpractice, purportedly including the amount Underwriters paid to SFA under the SFA Settlement Agreement. Id. ¶¶ 34, 39.
On November 19, 2018, Underwriters filed a motion for partial summary judgment as to the FAC. Dkt. 76. The same day, Scottsdale filed a motion for summary judgment as to Scottsdale's claims in the FAC as well as Underwriters' counterclaim for equitable contribution. Dkt. 90.
II. Standard of Review
Summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of ... [the factual record that] demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies its initial burden, the non-moving party must demonstrate with admissible evidence that genuine issues of material fact exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp. , 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("When the moving party has carried its burden under Rule 56 ... its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.")
A material fact for purposes of summary judgment is one that "might affect the outcome of the suit" under the applicable law. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. Although a court must draw all inferences from the facts in the non-movant's favor, id. at 255, 106 S.Ct. 2505, when the non-moving party's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it, [the] court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris , 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).
The underlying facts articulated above are undisputed, and the parties dispute only the legal significance of those facts. Indeed, the parties appear to be in agreement that summary judgment is appropriate to resolve this case as a matter of law, without the need for a trial to determine any disputed facts. See Dkt. 104 at 1 (Dickstein stating in opposition to Scottsdale's motion for summary judgment that "[a]ll parties now agree that this case is ripe for summary judgment"); Dkt. 130 at 1 (Underwriters' opposition to Scottsdale's motion stating that "the Court should resolve this case as a matter of law" and that "[n]o trial is necessary"). Scottsdale's argument that there are disputed facts regarding which policy period is even at issue, Dkt. 138 at 24, is irrelevant because such a question is immaterial to the specific legal issues to be resolved in this action. Thus, summary judgment is the appropriate manner to resolve the parties' claims in this case.
III. Analysis
The parties raise three discrete issues in the briefing on the motions for summary judgment. First, does the SFA Settlement Agreement erode the policy limits for the Primary Policy? Second, does the SFA Settlement Agreement erode the policy limits for the First Excess Policy? Third, if the SFA Settlement Agreement does *814 erode policy limits under the First Excess Policy, is Scottsdale required to reimburse the other subscribers to the First Excess Policy under the theory of equitable contribution?
A. The Court Has Jurisdiction over the Parties' Claims for Declaratory Relief
As an initial matter, the Court has jurisdiction over the parties' claims for declaratory relief. To maintain a lawsuit for declaratory relief under the Declaratory Judgment Act, the party seeking relief must present an actual case or controversy within the meaning of Article III. See Gov. Emps. Ins. Co. v. Dizol , 133 F.3d 1220, 1222 (9th Cir. 1998). A court must first determine whether there is a case of actual controversy within the court's jurisdiction, and if so, the court must decide whether to exercise its discretion to take jurisdiction over the controversy. Am. States Ins. Co. v. Kearns , 15 F.3d 142, 143-44 (9th Cir. 1994).
The Ninth Circuit has "consistently held that a dispute between an insurer and its insureds over the duties imposed by an insurance contract satisfies Article III's case and controversy requirement." Dizol , 133 F.3d at 1222 n. 2 (citations omitted). Scottsdale and Underwriters maintain disputed positions regarding the coverage that should be provided to Dickstein in the Muhs Action, and Dickstein similarly seeks a judicial declaration as to which insurers are responsible for Dickstein's defense. The questions of whether the Primary Policy has been exhausted by the SFA Settlement Agreement and whether the First Excess Policy is the operative policy for the Muhs Action are appropriate questions to be resolved through the declaratory relief Scottsdale-and Dickstein-seeks in this action. Scottsdale's request for relief is not an impermissible attempt to override the settlement reached by Underwriters in the SFA Action, and Scottsdale is not bringing a claim for equitable subrogation against Underwriters in connection with any actions by Underwriters allegedly taken in bad faith.[3] Scottsdale simply seeks a judicial declaration as to the legal effect of the SFA Settlement Agreement on the parties' insurance policies so that the Muhs Action may proceed with certainty. See, e.g. , Imperium Ins. Co. v. Unigard Ins. Co. , 16 F. Supp. 3d 1104, 1109 (E.D. Cal. 2014) (finding *815 declaratory relief appropriate to "clarify which insurance policy covers the claim made in the underlying action" and to "determine prospective liability as to the duty to indemnity" on a going-forward basis); Clarendon Nat'l Ins. Co. v. Ins. Co. of the West , 442 F. Supp. 2d 914, 944 (E.D. Cal. 2006) (finding a justiciable controversy to clarify "the respective rights and responsibilities of [multiple insurers] under policies of insurance issued by the parties").
The Court finds it appropriate to exercise its discretion to resolve this controversy. Doing so will not involve "needless determination of state law issues," will not encourage "forum shopping" by parties seeking to overcome state court jurisdiction, and will clarify the parties' respective rights and obligations under the Primary Policy and/or the First Excess Policy without the need for "duplicative litigation." See Principal Life Ins. Co. v. Robinson , 394 F.3d 665, 672 (9th Cir. 2005) (quoting Dizol , 133 F.3d at 1225 ); see also Brillhart v. Excess Ins. Co. of Am. , 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). The Court will proceed to address the questions raised by the parties in their requests for declaratory relief.
B. Whether the SFA Settlement Agreement Erodes the Primary Policy Limits
The thrust of Scottsdale's position in this case is that the SFA Action, and the ensuing SFA Settlement Agreement, pertained only to claims against Underwriters for Underwriters' direct liability for bad faith denial of defense coverage to Hettrick for the Hettrick Malpractice Action. Scottsdale argues that, because the almost $64 million uncontested judgment in the Hettrick Malpractice Action would not have occurred had Underwriters tendered a defense to Hettrick pursuant to the Primary Policy, Underwriters' bad faith denial of coverage to Hettrick was the sole proximate cause of the $64 million judgment. Scottsdale therefore construes the SFA Settlement Agreement as a settlement only of the bad faith insurance claim, which is not a covered "claim" under the Primary Policy and does not erode the Primary Policy limits at all.
The effect of the SFA Settlement Agreement on the policy limits of the Primary Policy is strictly a matter of interpreting the insurance contract at issue. Under California law,[4] a court must give effect to the parties' mutual intentions in forming the contract, which is first determined by referring solely to the written provisions of the contract. Palacin v. Allstate Ins. Co. , 119 Cal. App. 4th 855, 861, 14 Cal.Rptr.3d 731 (2004). "The rules governing policy interpretation require [a court] to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." Waller v. Truck Ins. Exchange, Inc. , 11 Cal. 4th 1, 18, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). A court must adhere to the "clear and explicit meaning" of the provisions of an insurance contract, as interpreted in their "ordinary and popular sense," unless the parties' selected language was used "in *816 a technical sense" or with "special meaning." Id. (internal quotation marks and citations omitted). A provision in an insurance policy is ambiguous if the provision "is capable of two or more constructions, both of which are reasonable." Id. (citation omitted). To determine whether an insurance provision is ambiguous, a court must interpret the language in the insurance contract as a whole, considering the circumstances and context of the case. Id. Thus, the court cannot merely find a provision "ambiguous in the abstract." Id. Furthermore, a court must not "adopt a strained or absurd interpretation in order to create an ambiguity where none exists." Bartlome v. State Farm Fire & Cas. Co. , 208 Cal. App. 3d 1235, 1239, 256 Cal.Rptr. 719 (1989) (citing Reserve Ins. Co. v. Pisciotta , 30 Cal. 3d 800, 807, 180 Cal.Rptr. 628, 640 P.2d 764 (1982) ). A court's interpretation of an insurance policy, including whether the policy language is ambiguous, is a question of law. Waller , 11 Cal. 4th at 18, 44 Cal.Rptr.2d 370, 900 P.2d 619.
Here, the Primary Policy obligates Underwriters to pay "Damages and Claims Expenses which the Assured shall become legally obligated to pay because of any Claim or Claims ... arising out of any act, error, or omission of the Assured ... in rendering or failing to render professional services." Dkt. 80-1 at 5. It is undisputed that Hettrick was an "Assured" under the Primary Policy, which FKB acknowledges in the letter denying coverage to Hettrick. See Dkt. 93-15 at 7 ("Hettrick is an Assured under the Policy."). A "Claim" is defined as a "demand received by any Assured for money or services including the service of suit or institution or [sic] arbitration proceedings against the Assured." Id. at 10. Per this language, the Hettrick Malpractice Action constituted a "Claim" against Hettrick arising out of Hettrick's failure to render competent professional legal services to MBW. "Damages" is defined in the Primary Policy to mean "a monetary judgment, award or settlement." Id. Unquestionably, the $64 million judgment of the Hettrick Malpractice Action was a legal obligation Hettrick (or the Estate) was liable to pay, meaning that the judgment constituted "Damages" under the Primary Policy.
SFA's claims against Underwriters in the SFA Action included claims for breach of the insurance contract for Underwriters' failure to defend Hettrick in the Hettrick Malpractice Action, which resulted in a judgment against the Estate in the Hettrick Malpractice Action. See Dkt. 93-7 ¶¶ 44-58 (SFA's claims for breach of contract). The breach of contract claims sought recovery under the terms of the insurance policies at issue, including up to and above the limits of the Primary Policy. SFA's success on those claims would necessarily depend on a finding that the Primary Policy did indeed extend coverage to Hettrick for the Hettrick Malpractice Action, meaning that the uncontested judgment in the Hettrick Malpractice Action would be a covered "Claim" for "Damages" for which Underwriters was responsible under the Primary Policy. Had SFA been successful on the breach of contract claims, the judgment would signify that Underwriters is responsible to provide insurance coverage under the Primary Policy to SFA, the assignee of Hettrick's rights as an insured under the Primary Policy, for "damages" that Hettrick was legally obligated to pay arising out of Hettrick's malpractice in the rendering of professional legal services. Therefore, the potential damages sought in the SFA Action included indemnity payments under the Primary Policy, and the SFA Action clearly implicates insurance coverage under the unambiguous terms of the Primary Policy.
Underwriters had the right to negotiate a settlement of the claims in the *817 SFA Action covered by the Primary Policy without Scottsdale's consent. Indeed, "a primary insurer may negotiate a good faith settlement of a claim in an amount which invades excess coverage, and [ ] the primary insurer may enter into such settlement binding upon the excess insurer without the excess insurer's consent, notwithstanding [a] 'no action' clause" in the excess insurer's policy. Diamond Heights Homeowners Ass'n v. Nat'l Am. Ins. Co. , 227 Cal. App. 3d 563, 580, 277 Cal.Rptr. 906 (1991). Underwriters agreed to pay the limits of the Primary Policy for claims that are potentially covered under the Primary Policy, and Scottsdale has not explained how the Court is authorized to reverse Underwriters' decision to make a payment under their own insurance policies. Accordingly, it was appropriate for Underwriters to pay SFA pursuant to the SFA Settlement Agreement under the Primary Policy limits in order to resolve all of the claims in the SFA Action, which included claims falling within the insurance coverage provided by the Primary Policy.
Scottsdale does not argue that any language in the Primary Policy is ambiguous and should be construed differently than above. Instead, Scottsdale disputes the characterization of the SFA Settlement Agreement as a payment of "indemnity" under the terms of the Primary Policy. Scottsdale argues that, because the SFA Action also included a claim against Underwriters for bad faith in denying defense coverage to Hettrick, the entirety of the SFA Settlement Agreement must be construed as Underwriters' personal, extra-contractual liability without eroding the policy limits of the Primary Policy whatsoever. But Scottsdale provides no legal support for the proposition that, in an action containing both breach of insurance contract claims and bad faith denial of coverage claims against an insurer, any settlement of such an action must legally be deemed as the insurer's personal liability for bad faith without eroding the limits of the insurance policy.
Scottsdale's reliance on Amato v. Mercury Casualty Co. , 53 Cal. App. 4th 825, 61 Cal.Rptr.2d 909 (1997), is misplaced. In Amato , an insurer refused to provide defense coverage to an insured under an automobile insurance policy, relying on a policy exclusion barring coverage for injuries caused by the insured to resident relatives of the insured. Id. at 829, 61 Cal.Rptr.2d 909. Without a defense from the insurer, the insured could not afford to hire other counsel and received a default judgment in a lawsuit by the insured's injured relative. Id. at 830, 61 Cal.Rptr.2d 909. The insured sued the insurer, claiming that the insurer breached the covenant of good faith and fair dealing by refusing to defend the insured, despite having knowledge of facts that potentially made the "resident relative" exclusion inapplicable. Id. The trial court found that the insured's only recoverable damages were the insured's costs of defending the underlying lawsuit, which the insured stipulated did not exist, and therefore the trial court held that the insured suffered no compensable damages. Id. at 831, 61 Cal.Rptr.2d 909.
The California court of appeal reversed. First, the court explained that an insurer violates the insurance contract by breaching the duty to defend, but the insurer may be subject to tort remedies if the failure to defend was unreasonable. Id. Tort remedies for the unreasonable failure to defend constitute "the amount which will compensate for all the detriment proximately caused" by the breach of the duty to defend. Id. (quoting Cal. Civ. Code § 3333 ). The court held that, because the insured's inability to obtain other counsel directly resulted in a default judgment against the insured, the default judgment *818 was "a proximate result of [the insurer's] wrongful refusal to defend." Id. ; see also id. at 834, 61 Cal.Rptr.2d 909 (citing Campbell v. Superior Court , 44 Cal. App. 4th 1308, 1320, 52 Cal.Rptr.2d 385 (1996) for the proposition that "an insurer who wrongfully refuses to defend may tortiously breach the covenant of good faith and fair dealing and should be liable for consequential damages"). The court reasoned that the duty to defend is broader than the duty to indemnify and "lasts either until the conclusion of the underlying lawsuit or until the insurer can establish conclusively that there is no potential for coverage and therefore no duty to defend." Id. at 832, 61 Cal.Rptr.2d 909 (emphasis in original) (citing Montrose Chem. Corp. v. Superior Court , 6 Cal. 4th 287, 295, 299, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993) ). Thus, the court concluded that "where the insurer tortuously refuses to defend and as a consequence the insured suffered a default judgment, the insurer is liable on the judgment." Id. at 833, 61 Cal.Rptr.2d 909.
The court in Amato elaborated that an insurer that wrongfully refused to defend an insured is liable for an adverse judgment, "even when the judgment was rendered on a theory not within the policy coverage." Id. at 833, 61 Cal.Rptr.2d 909 (quoting Kapelus v. United Title Guar. Co. , 15 Cal. App. 3d 648, 653, 93 Cal.Rptr. 278 (1971) ). In reaching this result, the court rejected the argument that the insured must conduct a "trial within a trial" to prove that if the insurer had provided defense coverage, the insured's judgment would have been smaller. Id. at 835, 61 Cal.Rptr.2d 909 ; see also id. at 839, 61 Cal.Rptr.2d 909 (following Gray v. Zurich Ins. Co. , 65 Cal. 2d 263, 280, 54 Cal.Rptr. 104, 419 P.2d 168 (1966) in rejecting "imposing on the insured the 'impossible burden' of proving the extent of the loss caused by the insurer's breach" of the duty to defend) (internal quotation marks removed). The court noted that, for the insurer to preserve the right to dispute liability for a third-party judgment against the insured, the insurer "can obtain a declaratory judgment determining whether there is coverage ... or it can defend [the insured] under a reservation of rights." Id. at 833, 61 Cal.Rptr.2d 909 (quotation marks and citation omitted). Significantly, the court in Amato cited favorably to other cases that applied the above principles to situations where an insured has settled a third-party claim after the insurer refused to provide a defense or where the insured allowed for an unopposed judgment to be entered against it. See id. at 837-38, 61 Cal.Rptr.2d 909 (citing Samson v. Transamerica Ins. Co. , 30 Cal. 3d 220, 236-42, 178 Cal.Rptr. 343, 636 P.2d 32 (1981) ; Zander v. Texaco, Inc. , 259 Cal. App. 2d 793, 802, 66 Cal.Rptr. 561 (1968) ; Pruyn v. Agric. Ins. Co. , 36 Cal. App. 4th 500, 516-17, 42 Cal.Rptr.2d 295 (1995) ).
Amato has been followed for the "general rule" that "an insurer that wrongfully refuses to defend is liable on the judgment against the insured," and if the refusal to defend "is also unreasonable ... the insurer will be liable for consequential damages regardless of foreseeability." See Pershing Park Villas Homeowners Ass'n v. United Pac. Ins. Co. , 219 F.3d 895, 901 (9th Cir. 2000) (citations omitted). Other cases have noted that an insurer may be personally liable for consequential damages for breaching the duty to defend, "notwithstanding that another insurer had provided a defense to the action." Risely v. Interinsurance Exch. of the Automobile Club , 183 Cal. App. 4th 196, 216, 107 Cal.Rptr.3d 343 (2010) (citing Wint v. Fid. & Cas. Co. , 9 Cal. 3d 257, 263, 107 Cal.Rptr. 175, 507 P.2d 1383 (1973) ).
Scottsdale is correct that Amato and its related cases support the conclusion that *819 Underwriters could have been personally liable for the uncontested judgment against the Estate in the Hettrick Malpractice Action above and beyond the Primary Policy limits as a result of Underwriters' refusal to defend Hettrick, whether under a theory of contractual damages or tort damages for an unreasonable refusal to defend. Scottsdale's assertion is true even though Hettrick and the Estate received defense coverage from Hanover, Hettrick's malpractice insurer through HettrickLaw. However, conspicuously absent from the opinion in Amato or any other case cited by Scottsdale is any reference to the effect of extra-contractual consequential damages on the insurer's insurance policy limits. Scottsdale has not identified a case holding that, following an insurer's wrongful refusal to defend an insured, all consequential damages resulting therefrom are extra-contractual and cannot be applied to erode or exhaust the insurer's policy limits as pertaining to a "covered" claim under the insurance policy.
Even if California precedent did necessitate that all consequential damages from an insurer's bad faith refusal to defend were extra-contractual in nature and would not erode policy limits-which it apparently does not-Scottsdale ignores the fact that, in the SFA Action, SFA brought not only bad faith claims against Underwriters but also claims for breach of the insurance contract. For this reason alone, Scottsdale's belief that "the entirety of [Underwriters'] payment to SFA was made to resolve a direct claim against the primary carriers" for bad faith, Dkt. 138 at 23, is incorrect. Per Amato , if Underwriters was not "unreasonable" in failing to provide Hettrick with a defense, then Underwriters would not be subjected to additional consequential damages as a "tort" remedy, and the only recovery would be contractual in nature. If an insurer had a reasonable basis to conclude that a tendered defense was not covered by the insurance policy, contractual damages for the breach of the duty to defend are usually limited to "the costs of the defense" incurred by the insured. Amato , 53 Cal. App. 4th at 831, 61 Cal.Rptr.2d 909 ; see also, e.g. , Pruyn , 36 Cal. App. 4th at 514 n. 15, 42 Cal.Rptr.2d 295 ("[W]here the issues upon which coverage depends are not raised or necessarily adjudicated in the underlying action, then the insurer is free to litigate those issues in the subsequent action ... If, in that subsequent action, it is determined that there was no coverage then the measure of damages for a wrongful failure to defend would be limited to the costs and attorney's fees expended by the insured in defending the underlying action."). However, authorities interpreting Amato have concluded that consequential damages following the failure to defend should be recoverable even under a breach of contract theory. See Croskey et al., Cal. Practice Guide: Ins. Litig. (2018) § 7:692.3. In keeping with this notion, the entirety of the uncontested judgment in the Hettrick Malpractice Action could be recovered under a breach of contract theory alone, which would similarly apply to exhaust the Primary Policy limits. There is simply no legal basis for Scottdale's conclusion that the entirety of the damages sought in the SFA Action could only be awarded as extra-contractual under a theory of bad faith without affecting insurance policy limits.
At the time Underwriters settled the SFA Action, there had been no binding resolution of the question whether coverage of the Hettrick Malpractice Action was required under the Primary Policy. The SFA Settlement Agreement did not purport to make any legal determinations about whether coverage to Hettrick was required under the Primary Policy, or whether Underwriters acted reasonably in *820 denying a defense to Hettrick. Because the settlement occurred prior to any adjudication of the issues of coverage under the Primary Policy, there had been no legal determinations necessary to conclude whether Underwriters acted in "bad faith" in refusing to defend Hettrick or merely made a reasonable mistake making available only contractual damages. Underwriters theoretically may have been successful had they argued in the SFA Action that coverage to Hettrick was rightfully denied under the Primary Policy, even though insurers have a broader duty to defend insureds for any claims potentially covered under the policy. See Montrose , 6 Cal. 4th at 299-300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.
In light of the uncertainty surrounding the extent and nature of Underwriters' potential liability in the SFA Action, the amount paid by Underwriters to settle the SFA Action reflects Underwriters' assessment of the risk that Underwriters could be liable for bad faith in addition to the normal contractual damages for breach of the insurance contract, potentially subjecting Underwriters to liability for the full $64 million judgment in the Hettrick Malpractice Action as consequential damages. Putting the prudence of Underwriters' allocation of that settlement amount aside, because the SFA Action included claims potentially covered under the Primary Policy, nothing in the law precluded Underwriters from making a payment under the Primary Policy limits to resolve the SFA Action. In the end, Scottsdale has not articulated why Underwriters was legally unable to attribute any amount of the SFA Settlement Agreement toward the Primary Policy merely in light of Amato 's general representations that consequential damages may be available against an insurer that denied defense coverage in bad faith.
It is apparent that Scottsdale's intention in bringing this action is to relitigate the bad faith claims brought by SFA against Underwriters in the SFA Action. The bulk of Scottsdale's briefing attempts to characterize Underwriters' denial of coverage to Hettrick for the Hettrick Malpractice Action as patently unreasonable. Yet it is not for this Court to validate Scottsdale's position that Underwriters acted unreasonably in denying coverage to Hettrick, because those claims against Underwriters have been fully released via the SFA Settlement Agreement. Scottsdale may be displeased with Underwriters' decision to allocate the SFA Settlement Agreement to exhaust the Primary Policy limit, but as the excess insurer, Scottsdale has no independent right to veto a reasonable settlement decision made by the primary insurer. See Diamond Heights , 227 Cal. App. 3d at 580, 277 Cal.Rptr. 906. Instead, Scottsdale would only be entitled to pursue relief against the primary insurers through a theory of equitable subrogation, on the ground that the primary insurers breached the covenant of good faith and fair dealing owed to the insureds by improperly allocating the SFA settlement amount toward the policies. See Commercial Union Assurance Cos. v. Safeway Stores, Inc. , 26 Cal. 3d 912, 918, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980) (holding that a primary insurance carrier owes no duty to an excess carrier to act in good faith); Fireman's Fund Ins. Co. v. Md. Cas. Co. , 21 Cal. App. 4th 1586, 1600, 26 Cal.Rptr.2d 762 (1994) (primary and excess carriers owe no duty of good faith to each other in the absence of a direct contractual relationship between them).[5] Nor does the *821 First Excess Policy contain any contractual language giving Scottsdale or any of the other subscribers to the First Excess Policy the authority to challenge payments made by the Primary Policy insurers under the Primary Policy. Without any such language, Scottsdale as an excess insurer has no discernible ability to relitigate SFA's claims of bad faith against Underwriters or to object to Underwriters' decision to pay the policy limits of the Primary Policy to satisfy the settlement of potentially covered claims brought against Underwriters in the SFA Action.
To summarize, in order to determine the legal effect of the SFA Settlement Agreement on the policy limits of the Primary Policy, the sole question for the Court to resolve is the interpretation of the unambiguous contractual language in the Primary Policy itself. Because the SFA Action encompassed claims for breach of the insurance contract that potentially constituted "covered" claims under the unambiguous terms of the Primary Policy, and because Underwriters paid the policy limit of the Primary Policy to resolve those "covered" claims, the Primary Policy limits were exhausted, and Scottsdale has no ability to challenge the primary insurers' settlement decision.
C. Whether the SFA Settlement Agreement Erodes the First Excess Policy Limits
Because Underwriters' settlement of the SFA Action exhausted the Primary Policy limits, the next question is whether the SFA Settlement Agreement erodes the policy limits of the First Excess Policy. What constitutes a "covered" claim under the First Excess Policy is functionally identical to the coverage provided by the Primary Policy. Thus, for the same reasons as stated above, the Hettrick Malpractice Action, and the breach of insurance contract claims brought in the SFA Action, were potentially "covered" claims under the First Excess Policy as well. The only issue to resolve, therefore, is whether the First Excess Policy properly attached to the SFA Settlement Agreement due to the exhaustion of the Primary Policy.
The explicit terms of the First Excess Policy mandate that liability under the First Excess Policy attaches when the subscribers to the Primary Policy "have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses." Dkt. 80-2 at 5. California courts analyzing similar "have paid" language in excess insurance policies-also referred to as "loss payable" clauses-have concluded that such language unambiguously makes the excess insurance policy attach when and only when the full amount of the underlying insurance policies has actually been paid by the primary insurers. See Qualcomm, Inc. v. Certain Underwriters at Lloyd's, London , 161 Cal. App. 4th 184, 195-96, 73 Cal.Rptr.3d 770 (2008) ; Powerine Oil Co., Inc. v. Superior Court , 37 Cal. 4th 377, 402-03, 33 Cal.Rptr.3d 562, 118 P.3d 589 (2005) (finding that a standard "loss payable" clause in an excess insurance policy operated to prevent coverage under the excess policy because "the limits of the underlying primary [insurance] policy were neither paid nor exhausted");
*822 Denny's Inc. v. Chicago Ins. Co. , 234 Cal. App. 3d 1786, 1793, 286 Cal.Rptr. 507 (1991) (holding that a "loss payable" clause in a third-level excess insurance policy "unequivocally provide[s] that ... liability will attach only after the underlying insurer has paid ... the full amount of the underlying coverage, i.e., the policy limit" and that the excess insurers "will then be liable to pay 'only the excess' of the underlying policy limit") (emphasis removed). Specifically, the California court of appeal has held that "the phrase 'have paid ... the full amount of [indemnity],' particularly when read in the context of the entire excess policy and its function as arising upon exhaustion of primary insurance, cannot have any other reasonable meaning than actual payment of no less than the ... underlying [policy] limit." Qualcomm , 161 Cal. App. 4th at 195, 73 Cal.Rptr.3d 770.
In the SFA Settlement Agreement, Underwriters was not "held liable" under the Primary Policy, nor did Underwriters explicitly "admit" liability under the Primary Policy regarding the Hettrick Malpractice Action. See Dkt. 118-4. Nevertheless, following the SFA Settlement Agreement, Underwriters actually "paid" the policy limits of the Primary Policy to SFA as part of the settlement amount, internally labeling the payment an "urgent indemnity payment on behalf of [Underwriters] subscribing to the Primary $15M layer." Dkt. 118-12 at 1 (emphasis removed); see also Dkt. 118-5 (email from Brit to Underwriters' claims processor requesting payment of the SFA Settlement Agreement pursuant to the Primary Policy and attaching the SFA Settlement Agreement and the Allocation Sheet). From the factual record established above, it is undisputed that Underwriters, as subscribers to the Primary Policy, actually paid the full $15 million policy limit of the Primary Policy through the SFA Settlement Agreement, combined with the prior erosion of the Primary Policy limit from unrelated claims. Therefore, the payment of the settlement amount pursuant to the SFA Settlement Agreement exhausted the Primary Policy, and liability under the First Excess Policy attached following the SFA Settlement Agreement.
Underwriters, in their capacity as subscribers to the First Excess Policy, paid $4,501,454 toward the settlement sum that resolved the SFA Action. For the same reasons articulated in the analysis above, nothing precluded Underwriters from paying a portion of the policy limits of the First Excess Policy to settle the claims in the SFA Action potentially covered under the First Excess Policy. When an excess insurer is presented with a proposed settlement of a potentially covered claim approved by both the primary insurer and the insured party, the excess insurer has three distinct options: "The excess insurer must (1) approve the proposed settlement, (2) reject it and take over the defense, or (3) reject it, decline to take over the defense, and face a potential lawsuit by the insured seeking contribution toward the settlement." Teleflex Med. Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA , 851 F.3d 976, 979 (9th Cir. 2017) (citing Diamond Heights , 227 Cal. App. 3d at 580-81, 277 Cal.Rptr. 906 ). As excess insurers, Underwriters chose the first option and approved the SFA Settlement Agreement, knowing that Underwriters would be responsible to pay a portion of the settlement sum under the limits of the First Excess Policy.
Underwriters' consent to the SFA Settlement Agreement, in their capacity as excess insurers, satisfies the provision in the First Excess Policy that "[n]o settlement of a claim shall be effected by the Assured for such a sum as will involve this Policy without the consent of Underwriters *823 hereon." Dkt. 80-3 at 5. Underwriters were not required to provide their consent, but voluntarily chose to do so; in effect, Underwriters' agreement to pay a portion of the SFA Settlement Agreement out of the policy limits for the First Excess Policy amounted to a waiver of any defenses to coverage under the First Excess Policy that Underwriters otherwise could have advanced in the SFA Action. For the same reasons as with the Primary Policy, because the unambiguous terms of the First Excess Policy were satisfied by the SFA Settlement Agreement, there is no basis to hold that the Underwriters subscribers to the First Excess Policy were not permitted to pay a portion of the SFA settlement under the policy limits of the First Excess Policy.
Accordingly, because Underwriters actually paid a portion of the limits of the First Excess Policy to resolve potentially covered claims via the SFA Settlement Agreement, the First Excess Policy was eroded by $4,501,454, which is the amount of the SFA Settlement Agreement that Underwriters paid out of the First Excess Policy.
D. Underwriters' Claim Against Scottsdale for Equitable Contribution
Because the SFA Settlement Agreement eroded the First Excess Policy, Underwriters seek to hold Scottsdale liable for Scottsdale's pro rata share of the portion of the SFA Settlement Agreement allocated to the First Excess Policy, pursuant to the theory of equitable contribution. Under California law, equitable contribution in the insurance context is summarized as follows:
[T]he right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was equally and concurrently owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others.
Fireman's Fund Ins. Co. v. Md. Cas. Co. , 65 Cal. App. 4th 1279, 1294, 77 Cal.Rptr.2d 296 (1998) (citations omitted). Equitable contribution is distinct from a claim for equitable subrogation, because the former "exists independently of the rights of the insured," id. at 1295, 77 Cal.Rptr.2d 296 (emphasis removed), and therefore the coverage provided under the shared insurance policy may be allocated among the subscribing insurers "without regard to questions of comparative fault or the relative equities between the insurers," id. (citations omitted). Contribution may be had only between insurers providing coverage for the same level of liability on the same risk; "in the absence of an express agreement to the contrary, there is never any right to contribution between primary and excess carriers of the same insured." Id. at 1300, 77 Cal.Rptr.2d 296 (emphasis removed); see also id. at 1294 n. 4, 77 Cal.Rptr.2d 296 ("The doctrine of equitable contribution applies to insurers who share the same level of obligation on the same *824 risk as to the same insured.") (emphasis in original).
Because the purpose of equitable contribution is to accomplish "substantial justice," it is within the trial court's "broad discretion" to determine the proper method of apportioning costs among the co-insurers to the same level of risk. See Md. Cas. Co. v. Nationwide Mut. Ins. Co. , 81 Cal. App. 4th 1082, 1094, 97 Cal.Rptr.2d 374 (2000) ; see also Axis Surplus Ins. Co. v. Glencoe Ins. Ltd. , 204 Cal. App. 4th 1214, 1231, 139 Cal.Rptr.3d 578 (2012) ("When a trial court is required to evaluate claims for equitable contribution ... the trial court exercises its discretion and weighs the equities seeking to attain distributive justice and equity among the mutually liable insurers."). Courts have developed several alternate methods to quantify each co-insurer's respective risks covered under a shared insurance policy, including "methods based on policy limits, time on the risk, policy limits multiplied by time on the risk, equal shares, and other factors." Md. Cas. Co. , 81 Cal. App. 4th at 1094, 97 Cal.Rptr.2d 374. "The court may consider numerous factors in making its determination, including the nature of the underlying claim, the relationship of the insured to the various insurers, the particulars of each policy, and any other equitable considerations." Axis Surplus , 204 Cal. App. 4th at 1231-32, 139 Cal.Rptr.3d 578.
1. Scottsdale Was Not Obligated to Provide Coverage to Hettrick under the First Excess Policy
The unique facts of this case impose a troublesome analysis of the question of whether equitable contribution even applies in the first instance. At first glance, the basic elements for equitable contribution appear to be met in this case. The subscribers to the First Excess Policy seek equitable contribution from Scottsdale for the amount of the SFA settlement sum allocated to the First Excess Policy limits. Scottsdale shares the same level of obligation as the Underwriters subscribers to the First Excess Policy, provides coverage for the same defense and indemnity risks as the other subscribers to the First Excess Policy, and insures the same insured parties as the other subscribers to the First Excess Policy. As detailed above in this Order, the settlement of the SFA Action was not only for Underwriters' extra-contractual liability for claims of bad faith in refusing to defend Hettrick, but also released all claims against Underwriters for breach of the insurance contract, which did implicate the insurance policy limits under both the Primary Policy and the First Excess Policy. Therefore, Scottsdale was an insurer of a portion of the "risks" posed by the SFA Action on even keel with the Underwriters subscribing to the First Excess Policy.[6]
However, most importantly, equitable contribution applies only where the insurer from which contribution is sought also had a legal obligation to provide coverage for the insured. "One of the firm principles undergirding the doctrine of equitable contribution is that two or more insurers share an obligation to the common insured ... [W]here there is no common obligation that is legally due from *825 multiple insurers, then no basis for contribution exists." Am. Continental Ins. Co. v. Am. Cas. Co. , 86 Cal. App. 4th 929, 937-38, 103 Cal.Rptr.2d 632 (2001) (emphasis removed). "Of course, if one insurer never had an obligation to provide coverage, it would be extremely unfair to enforce a contribution action." Axis Surplus , 204 Cal. App. 4th at 1228, 139 Cal.Rptr.3d 578 (citing Am. Continental , 86 Cal. App. 4th at 938, 103 Cal.Rptr.2d 632 ). Thus, to conclude that an absent insurer must contribute to the defense or indemnity provided by its co-insurers, a court "must first determine if that coverage obligation ever arose or existed under the policy [the absent insurer] issued to [the insured]." Am. Continental , 86 Cal. App. 4th at 938, 103 Cal.Rptr.2d 632. The burden of proof of coverage falls initially with the settling insurer, which only needs to make a "prima facie showing of potential coverage under the nonparticipating insurer's policy." Axis Surplus , 204 Cal. App. 4th at 1223, 139 Cal.Rptr.3d 578 (citations omitted). The burden then shifts to the insurer from which contribution is sought to "prove an absence of actual coverage under its policy." Id. (citations omitted).
The Scottsdale First Excess Policy requires that any claims against an insured which appear likely to exceed the coverage available under the Primary Policy "be notified immediately by the Assured in writing to the Underwriters hereon." Dkt. 80-3 at 8. For any claims to which Scottsdale may be liable to contribute, "no costs shall be incurred on [Scottsdale's] behalf without [Scottsdale's] consent being first obtained (such consent not to be unreasonably withheld)." Id. In addition, "[n]o settlement of a claim shall be effected by the Assured for such a sum as will involve this Policy without the consent of [Scottsdale] hereon." Id.
The stipulation reached in the Hettrick Malpractice Action which led to an uncontested judgment in the amount of almost $64 million was never tendered to Scottsdale as a claim falling within the bounds of the First Excess Policy. In fact, Scottsdale did not have formal notice of the Hettrick Malpractice Action at all, because the Notice of Circumstance letter tendered by Hettrick's attorney to FKB did not specify under which policy or policies defense coverage was sought. See Dkt. 93-13. FKB was the agent for notice of claims not only for Underwriters under the Primary Policy but also for both Underwriters and Scottsdale under the First Excess Policy, meaning that Scottsdale conceivably could be attributed with constructive notice of the Hettrick Malpractice Action. However, FKB's response to Hettrick's attorney acknowledging the Notice of Circumstance made reference only to the identification number for the Primary Policy. See Dkt. 116-2. Without formal notice to Scottsdale of the Hettrick Malpractice Action or the ensuing uncontested judgment of almost $64 million, and without formal acknowledgment of the Notice of Circumstance as a potential claim implicating the First Excess Policy by either Scottsdale or FKB, Scottsdale did not provide its consent to the costs of the Hettrick Malpractice Action prior to the time those costs were incurred.
Even if the Notice of Circumstance to Underwriters and FKB could constitute formal notice to Scottsdale under the First Excess Policy on the ground that Hettrick did not identify under which specific insurance policy he sought coverage, it is dispositive that the letter from FKB denying coverage to Hettrick for the Hettrick Malpractice Action referenced only the identification number of the Primary Policy, referring to the insurers denying coverage as "Underwriters at Lloyd's, London" without referencing Scottsdale. See *826 Dkt. 93-15 at 2. After Underwriters denied coverage under the Primary Policy, Hettrick never requested defense coverage from Scottsdale under the First Excess Policy. And in any event, Scottsdale would not have been legally obligated to provide defense coverage had Hettrick tendered a claim under the First Excess Policy, because liability to provide defense coverage to an insured does not attach under the First Excess Policy states that "unless and until the Underwriters of the [Primary Policy] shall have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses." Dkt. 80-2 at 5. Therefore, Scottsdale had no duty to defend Hettrick in the Hettrick Malpractice Action under the First Excess Policy following Underwriters' denial of coverage under the Primary Policy, and Scottsdale cannot be held liable for equitable contribution in the absence of a legal obligation to contribute. See Am. Continental , 86 Cal. App. 4th at 938-39, 103 Cal.Rptr.2d 632 (rejecting a claim for equitable contribution based on a finding that an insurer was not legally obligated to provide defense coverage because notice was not provided to the insurer as required by the insurance policy).
Scottsdale's refusal to consent to an allocation of the SFA settlement toward Scottsdale's policy limits under the First Excess Policy was not unreasonable given the absence of a legal obligation for Scottsdale to provide coverage to Hettrick as an excess carrier. Scottsdale maintained strong defenses to coverage of the Hettrick Malpractice Action as identified above, independent of Underwriters' potential defenses to coverage as the Primary Policy insurers. Underwriters, in their capacity as excess insurers, could have advanced the same arguments as Scottsdale in an effort to seek to avoid liability under the First Excess Policy as part of the SFA Action. Underwriters were disincentivized to do so, however, because any dollar not attributed to the First Excess Policy otherwise would be incurred personally by Underwriters as extra-contractual liability. In accord, Underwriters voluntarily agreed to pay a portion of the SFA settlement from the First Excess Policy, and in the process Underwriters effectively waived any defenses to coverage they might otherwise have advanced under the First Excess Policy. Scottsdale's refusal to participate in the settlement of the SFA Action can be recharacterized as Scottsdale's refusal to voluntarily waive its coverage defenses regarding the Hettrick Malpractice Action, which is anything but unreasonable. As American Continental noted, "if there was no contractual obligation [on the part of the non-settling insurer], then there can be no successful assertion of a claim for equitable contribution by [the settling insurer] merely because it chose, in the pursuit of its own interests and obligations, to settle the [underlying] action by purchasing the peace of its insureds." Am. Continental , 86 Cal. App. 4th at 939, 103 Cal.Rptr.2d 632.
Furthermore, from an equitable sense, the specific factual context behind the SFA Action also supports Scottsdale's refusal to acquiesce to Underwriters' requests to participate in the SFA Settlement Agreement. Underwriters subscribed to both the Primary Policy and the First Excess Policy, while Scottsdale was the lone insurer that subscribed only to the First Excess Policy. Although SFA included Scottsdale as a defendant in the SFA Action, SFA's claims for bad faith were brought primarily against Underwriters in their capacity as the Primary Policy insurers, given that the Primary Policy insurers-not Scottsdale-were responsible for denying defense coverage to Hettrick in the Hettrick Malpractice Action. See *827 Dkt. 93-15 at 2 (denial of coverage letter referencing only the Primary Policy). Scottsdale's refusal to consent to any payment to SFA under the First Excess Policy was justified in the sense that Scottsdale believed that the entirety of any settlement amount would be attributed to resolve the bad faith claims, and Underwriters did not reveal any intent to allocate a portion of the SFA settlement to the First Excess Policy limits until after Underwriters' market meeting in November 2017. No such representations were made during the mediation to resolve the SFA Action, at which Scottsdale was present. Had Underwriters indicated during the mediation that the $17.5 million lump sum payment would be allocated in any way toward the First Excess Policy, Scottsdale surely would have objected at that time rather than remaining a passive observer. Scottsdale's silence cannot be held as a waiver of Scottsdale's strong defenses to coverage of the Hettrick Malpractice Action as an excess carrier, particularly in light of these convoluted facts.
Underwriters' cited cases supporting the argument that equitable contribution should require Scottsdale to pay its share of the First Excess Policy payments under the SFA settlement are unavailing. Although an excess insurer may not challenge a settlement decision by a primary insurer if the excess insurer denies coverage for a third-party claim against an insured, see United Servs. Auto. Ass'n v. Alaska Ins. Co. , 94 Cal. App. 4th 638, 644, 114 Cal.Rptr.2d 449 (2001), here Scottsdale never denied coverage to Hettrick because Scottsdale's coverage for the Hettrick Malpractice Action was never sought. And Underwriters' settlement of the SFA Action was not a settlement of a third-party claim against an insured; the settlement pertained to Underwriters' direct liability, whether contractual or extra-contractual, for failing to defend Hettrick in the underlying action. Scottsdale is not challenging Underwriters' decision to settle a third-party claim on behalf of an insured but instead rebukes the notion that Scottsdale should contribute to the settlement of the SFA Action ultimately reached by Underwriters. Because Scottsdale was never asked to participate in the defense of Hettrick, Scottsdale did not waive its right to object to payment of the SFA settlement sum pursuant to Scottsdale's subscription to the First Excess Policy.
Fuller-Austin Insulation Co. v. Highlands Insurance Co. , 135 Cal. App. 4th 958, 38 Cal.Rptr.3d 716 (2006), is also inapposite. There, the court held that an insurer could not escape liability for an insured's settlement by withholding consent to a settlement under a "consent" requirement in the insurance policy where the insurer was informed of the impending settlement and given an opportunity to participate in the negotiations. See id. at 985, 38 Cal.Rptr.3d 716. But here, the analogous settlement negotiations relevant to this case are those in the underlying Hettrick Malpractice Action, not the settlement of the SFA Action. Scottsdale had no formal notice of the Hettrick Malpractice Action and was not asked to participate in any of the proceedings in the Hettrick Malpractice Action, including the stipulation to allow for an uncontested judgment against the Estate. Because Scottsdale possessed legitimate defenses to coverage of the Hettrick Malpractice Action under the terms of the First Excess Policy, Scottsdale rightfully refused under the terms of the Scottsdale First Excess Policy to consent to contribute toward any settlement of the SFA Action. See also Crowley Mar. Corp. v. Fed. Ins. Co. , No. C 08-00830 SI, 2008 WL 5071118, at *8-9 (N.D. Cal. Dec. 1, 2008) (distinguishing Fuller-Austin on the basis that, in this case, "settlement negotiations concluded *828 before [the excess insurers] were notified that they had begun").
Underwriters also suggest that Scottsdale could have elected to "drop down" to defend Hettrick in the Hettrick Malpractice Action. See Dkt. 130 at 4 n. 3. This argument is incorrect. Whether an excess carrier must "drop down" to assume the obligations of a primary carrier depends on the language of the excess policy. Travelers Cas. & Sur. Co. v. Am. Int'l Surplus Lines Ins. Co. , 465 F. Supp. 2d 1005, 1022 (S.D. Cal. 2006). "It is settled under California law that an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise, until all of the primary insurance has been exhausted." Cmty. Redevelopment Agency v. Aetna Cas. & Sur. Co. , 50 Cal. App. 4th 329, 339, 57 Cal.Rptr.2d 755 (1996) (emphasis in original). Here, the Scottsdale First Excess Policy does not attach "unless and until the Underwriters of the Underlying Policy(ies) shall have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses." Dkt. 80-3 at 8. There is no indication that the First Excess Policy was triggered by the filing of the Hettrick Malpractice Action, and Underwriters has not articulated a basis for concluding that Scottsdale was legally obligated to drop down to cover Hettrick when the Primary Policy insurers would not. Consequently, the fact that Scottsdale did not step in to defend Hettrick on Scottsdale's own initiative, without formal notice of the Hettrick Malpractice Action or a direct request for defense coverage from Hettrick, does not result in a waiver of Scottsdale's right to assert that coverage of the Hettrick Malpractice Action did not attach to the Scottsdale First Excess Policy.
Based on the above, Scottsdale was not legally obligated to share in the defense or indemnity of the Hettrick Malpractice Action pursuant to the terms of the First Excess Policy. Therefore, equitable contribution does not apply to require Scottsdale to contribute to any portion of the settlement sum to resolve the SFA Action.
2. Even If Coverage to Hettrick Existed under the Scottsdale First Excess Policy, Underwriters Have Not Met Their Burden to Prove a Non-Collusive Allocation of the SFA Settlement Agreement
Even assuming that Scottsdale was obligated to provide coverage for the Hettrick Malpractice Action, Underwriters' claim for equitable contribution must fail. Underwriters have not met their burden to prove an allocation of the SFA Settlement Agreement between SFA's claims covered by the insurance policies-i.e. , the breach of insurance contract claims-and claims falling outside the scope of the insurance policies-i.e. , the claims for bad faith refusal to defend Hettrick.
"[A]n excess insurer faced with a settlement that invades its coverage may either assume the defense and settle or try the matter, or challenge the settlement on the grounds of unreasonableness, fraud or collusion." Fuller-Austin , 135 Cal. App. 4th at 987, 38 Cal.Rptr.3d 716 (citing Diamond Heights , 227 Cal. App. 3d at 582, 277 Cal.Rptr. 906 ). Here, Scottsdale has undertaken the latter option, arguing that the settlement of the SFA Action reached by Underwriters allocating the bulk of the settlement sum to the policy limits under the Primary Policy and the First Excess Policy was the product of collusion.
When a settlement agreement resolves multiple claims, some of which are covered by an insurance agreement and others which are not, there is a presumption that an agreement between the parties *829 to allocate the settlement sum between the claims in a certain manner is a reasonable valuation of the amount of the settled claims. See Regan Roofing Co. v. Superior Court , 21 Cal. App. 4th 1685, 1700-01, 27 Cal.Rptr.2d 62 (1994). For the presumption in favor of allocation to apply, the parties to the settlement have the burden to "explain to the court and to all other parties the evidentiary basis for any allocations and valuations made, and must demonstrate that the allocation was reached in a sufficiently adversarial manner." Id. (citing Erreca's v. Superior Court , 19 Cal. App. 4th 1475, 1495-96, 24 Cal.Rptr.2d 156 (1993) ; Abbott Ford, Inc. v. Superior Court , 43 Cal. 3d 858, 879, 239 Cal.Rptr. 626, 741 P.2d 124 (1987) ). "An allocation that is collusive, and not the result of adverse negotiations between parties with competing interests, is suspect" under California law, and the settlement and allocation should be rejected. Dillingham Const., N.A., Inc. v. Nadel P'ship, Inc. , 64 Cal. App. 4th 264, 286, 75 Cal.Rptr.2d 207 (1998) ; see also Peter Culley & Associates v. Superior Court , 10 Cal. App. 4th 1484, 1498, 13 Cal.Rptr.2d 624 (1992) (there is "no justification for giving presumptive effect to an allocation that is not the product of adverse negotiation"). Collusion can be found "where only one of the parties cares how proceeds are allocated." Dillingham , 64 Cal. App. 4th at 286, 75 Cal.Rptr.2d 207.
"The testimony of an attorney for the party seeking [the benefits of an allocation] is not reliable evidence of the allocation." Res-Care Inc. v. Roto-Rooter Servs. Co. , No. C-09-03856 EDL, 2011 WL 3353893, at *14 (N.D. Cal. Aug. 3, 2011). On the other hand, "speculation" as to why an allocation of a settlement sum was silent regarding a particular claim is insufficient to overcome the presumptive effect of the allocation of the settlement to the other claims. MGA Entm't, Inc. v. Hartford Ins. Grp. , No. ED CV 08-0457-DOC(RNBx), 2012 WL 628203, at *5 (C.D. Cal. Feb. 24, 2012), vacated in part and superseded in part by MGA Entm't, Inc. v. Hartford Ins. Grp. , 869 F. Supp. 2d 1117 (C.D. Cal. 2012).
Allocation of the SFA Settlement Agreement in this case presents a unique posture. In a typical case addressing allocation of a settlement amount, the allocation is necessary to resolve a subsequent claim for equitable indemnity by a party to a settlement that seeks to have some or all of the settlement covered by an insurer. Instead, here it is the Underwriters insurers under the First Excess Policy that are seeking to establish an allocation of the settlement amount between their own extra-contractual liability for bad faith denial of defense coverage (in their capacity as Primary Policy insurers) and contractual liability under the insurance policies, so that Underwriters can recoup from Scottsdale a portion of the payments made under the First Excess Policy.
The uniqueness of the facts of this case reveal the collusive nature of the purported allocation reached by Underwriters. Based on the undisputed facts presented to the Court, in the mediation to resolve the SFA Action, neither SFA nor Underwriters discussed a purported allocation of the settlement amount reached between the claims brought in the SFA Action. Instead, the Term Sheet executed by SFA and Underwriters explicitly contemplated that Underwriters would meet and negotiate internally to determine how to allocate the $17.5 million settlement sum between the Primary Policy, the Excess Policy, and ECO exposure. See Dkt. 116-14 at 1. Brit, the lead underwriter for the Primary Policy, exchanged emails with Beazley, the lead underwriter for the First Excess Policy, in an attempt to decide how to allocate the settlement sum fairly between the Primary *830 Policy and First Excess Policy. See Hill Decl. ¶¶ 15-16, 18; Marsh Decl. ¶ 15. When these negotiations were unsuccessful, Underwriters held a market meeting, where Brit advocated on behalf of the interests of the Primary Policy insurers and Beazley advocated on behalf of the Underwriters subscribers to the First Excess Policy. Hill Decl. ¶ 21. SFA did not participate in the allocation negotiations, because SFA had no pecuniary interest in how to allocate the settlement sum SFA would receive from Underwriters. Nor did Scottsdale participate, even though Scottsdale had advance notice of the market meeting. And Dickstein, the principal insured party under the insurance policies, also was not a party to the allocation negotiations, even though any allocation decision reached by Underwriters would affect the remaining coverage afforded to Dickstein under its malpractice insurance. Therefore, among the parties participating in the settlement of the SFA Action, only Underwriters had an interest in how to allocate the settlement amount across the claims.
Such a one-sided negotiation amongst only Underwriters operated as collusion, allowing Underwriters to settle on a favorable allocation of the settlement proceeds that could erode the limits of Underwriters' insurance policies to the maximum extent possible. See Dillingham , 64 Cal. App. 4th at 286, 75 Cal.Rptr.2d 207. Indeed, even though Brit and Beazley negotiated from adverse positions by representing the interests of the Primary Policy insurers and First Excess Policy insurers respectively, Brit and Beazley-and the other Underwriters insurers-were subscribers to both policy layers and therefore had a mutual interest to minimize the amount of ECO exposure above the policy limits that Underwriters had to bear from the settlement. Any extra-contractual payments by Underwriters would not reduce the policy limits for the insurance policies and would instead would be borne as Underwriters' out-of-pocket expenses. Brit and Beazley both subscribed to a 22.58% share of the Primary Policy; it would be a farce to suggest that Brit and Beazley had competing interests in the negotiations, when both would be forced to bear the exact same percentage of extra-contractual liability under the Primary Policy. Even though Beazley subscribed to a greater percentage share of the First Excess Policy, every dollar attributed to the First Excess Policy instead of to extra-contractual liability reduces the remaining policy limit under the First Excess Policy, thereby saving Beazley money to be owed on an ongoing basis under the First Excess Policy. Brit shared these exact same incentives, even as a lesser subscriber to the First Excess Policy.
Moreover, Underwriters as a whole were incentivized to direct as much of the settlement toward the First Excess Policy so that Underwriters could attempt to recover as much of the SFA settlement from Scottsdale, the lone non-participating insurer. See Dillingham , 64 Cal. App. 4th at 286, 75 Cal.Rptr.2d 207 (finding collusion where the only party making an allocation of a settlement between covered and non-covered claims "has an incentive to allocate as large a percentage of proceeds as possible to aspects of the [claims] for which the nonsettling defendant is potentially liable in order to maximize its potential [reimbursement] recovery"). Underwriters' position as both primary and excess insurers in this case inherently renders any internal negotiations about how to allocate the SFA settlement sum between the insurance policies and the primary insurers' extra-contractual liability collusive. Therefore, Underwriters is not entitled to a presumption that the Allocation Sheet is a reasonable allocation of the SFA settlement amount *831 between covered and non-covered claims. See Regan Roofing , 21 Cal. App. 4th at 1701, 27 Cal.Rptr.2d 62.
Without a presumption that the Allocation Sheet is a reasonable allocation of the SFA settlement amount, Underwriters have not put forward sufficient evidence to meet their burden to provide an evidentiary basis for any such allocation. See id. at 1700-01, 27 Cal.Rptr.2d 62.[7] Evidence of adverse positions between Brit and Beazley prior to the market meeting are insufficient to show what positions were actually taken during the market meeting itself. The Court is not privy to any representations or statements made during the market meeting, because neither party has presented any such evidence. In the analogous context of a motion for good faith determination regarding a settlement agreement, "[i]f [the settling parties] are not willing to put everything, including secret allocations, before the trial court on the good faith hearing, they cannot obtain the evidentiary benefit of a good faith finding." Dillingham , 64 Cal. App. 4th at 287, 75 Cal.Rptr.2d 207. Here too, Underwriters has not provided any evidence of the market meeting negotiations that would allow the Court to conclude that such negotiations were, in fact, adversarial and non-collusive.
Underwriters also did not provide the Court with any risk-based assessment of the claims asserted in the SFA Action to support the conclusion that allocating only $1,256,553 toward the Primary Policy insurers' extra-contractual liability. In fact, Scottsdale's argument that Underwriters simply engaged in a "math exercise" to account for Scottsdale's missing contribution has merit. Underwriters appears to have reached their purported allocation of extra-contractual liability by (1) taking the amount of the settlement that Underwriters did not allocate to Scottsdale ($17.5 million - Scottsdale's allocated share of $1,691,702 = $15,808,298), (2) determining the percentage of Underwriters' allocation that corresponded to payments by the Primary Policy insurers (remaining Primary Policy balance of $11,741,993 / $15,808,298 = approximately 74.28%), and applying that percentage to the share of the First Excess Policy payments allocated to Scottsdale (74.28% * $1,691,702 = approximately $1,256,553). Even if Underwriters settled on the allocation in the Allocation Sheet through a mathematical exercise solely to account for Scottsdale's gap, *832 which is likely because the math checks out, nothing necessarily precluded Underwriters from determining that such an allocation was a reasonable estimate of ECO exposure that should be borne by the Primary Policy insurers. But Underwriters did not present any evidence showing that this number is a reasonable estimate of the Primary Policy insurers' risk of being found liable for bad faith. Without anything more on the record, the Allocation Sheet is merely the product of a "collusive" negotiation at the market meeting and is more akin to after-the-fact testimony from Underwriters explaining "how [they] believe[ ] settlement proceeds would have been allocated had the parties negotiated and resolved the issue." Dillingham , 64 Cal. App. 4th at 285, 75 Cal.Rptr.2d 207 (emphasis added).
If the settling parties have failed to provide evidence of an allocation of the settlement amount between multiple claims, "the trial court must allocate in the manner which is most advantageous to the nonsettling party." Dillingham , 64 Cal. App. 4th at 287, 75 Cal.Rptr.2d 207. However, Dillingham and other case law addressing the issue of settlement allocations primarily do so in the context of a motion for a good faith determination regarding a settlement allocation. See, e.g. , id. at 269-70, 278-79, 75 Cal.Rptr.2d 207 (trial court approved a good faith settlement, which was the subject of appellate review); Regan Roofing , 21 Cal. App. 4th at 1696-1700, 27 Cal.Rptr.2d 62 (same). That is not an issue raised before the Court in this case, so the Court has no reason to make a good faith determination regarding Underwriters' allocation of the SFA settlement.[8] The procedure identified in Dillingham , where the Court allocates the settlement in a manner most advantageous to the nonsettling party, does not require the Court to identify what would be the hypothetical good-faith allocation that Underwriters could have reached, considering the risks posed by the SFA Action and the likelihood of success on the various claims brought against Underwriters.
Instead, for purposes of Underwriters' claim for equitable contribution, the case law cited above seemingly applies to require the Court simply to award Underwriters nothing for their claim. Indeed, Dillingham noted that
[i]n many situations of this kind where a settling defendant pursues a cross-claim for partial indemnity against a party who is not jointly and severally liable for all claims, allocating settlement proceeds in the way that most benefits the nonsettling defendant would mean that the cross-complainant recovers nothing because the proceeds should first be allocated to those for which the settling defendant is liable.
Dillingham , 64 Cal. App. 4th at 289, 75 Cal.Rptr.2d 207. The same logic applies to Underwriters' "cross-claim" against Scottsdale for equitable contribution; to allocate the SFA settlement most advantageously to Scottsdale, then the entirety of the SFA settlement would be allocated to Underwriters' extra-contractual liability, with the policy limits of both the Primary Policy and the First Excess Policy remaining intact. The Court does not make such a finding for purposes of the parties' respective claims for declaratory relief, because, as explained above, there is no basis in the law for such a conclusion. But, when isolating Underwriters' equitable claim for contribution from Scottsdale for the amount *833 Underwriters actually paid under the First Excess Policy, in light of the collusive nature of the allocation of the SFA settlement and the absence of any evidence suggesting that such an allocation was a reasonable assessment of the risks posed by the SFA Action, the only fair outcome is that Scottsdale cannot be required to contribute to Underwriters' settlement figure.
The balance of equities further supports this result. As explained above, the evidence shows that Scottsdale, the only excess carrier not subscribed to the Primary Policy, was not actively involved in the decision by the Primary Policy insurers not to defend Hettrick. As a result of Scottsdale's unique position as the only pure excess carrier, Scottsdale played a secondary role in the mediation and as a defendant in the SFA Action, because Scottsdale presumably only would be held liable if the subscribers to the First Excess Policy were found contractually liable to cover a portion of the uncontested judgment in the Hettrick Malpractice Action. But the overriding nature of the SFA Action was for the Primary Policy insurers' failure to defend Hettrick, which implicates only Underwriters. The nature of the claims in the SFA Action, coupled with Scottsdale's distinct role as purely an excess carrier compared to Underwriters' subscription to both the Primary Policy and the First Excess Policy, weigh heavily against requiring Scottsdale to contribute to a settlement effectuated solely by Underwriters. See Axis Surplus , 204 Cal. App. 4th at 1231-32, 139 Cal.Rptr.3d 578.
In conclusion, for the reasons stated above, it would be inequitable to require Scottsdale to contribute to the settlement of the SFA Action, in light of (1) Scottsdale's lack of obligation to provide coverage for the underlying malpractice action against the insured party under Scottsdale's insurance contract, and (2) Underwriters' failure to provide sufficient evidence to support the reasonableness of the allocation reached in a collusive negotiation process. Therefore, Scottsdale's motion for summary judgment as to Underwriters' counterclaim for equitable contribution is GRANTED.
IV. Conclusion
For the reasons set forth above, the Court issues the following declaratory relief:
(1) The Primary Policy has been exhausted by the SFA Settlement Agreement.
(2) The First Excess Policy is eroded by the SFA Settlement Agreement in an amount of $4,501,454.
(3) The First Excess Policy is the operative insurance policy for Dickstein's defense in the Muhs Action.
Scottsdale's motion for summary judgment as to Underwriters' claim for equitable contribution from Scottsdale regarding the portion of the SFA settlement allocated to the First Excess Policy is GRANTED. Judgment is entered in favor of Scottsdale on Underwriters' claim for equitable contribution, and Underwriters is not entitled to any monetary contribution from Scottsdale for the amount of the SFA Settlement Agreement Underwriters paid from the First Excess Policy.
Because the case is fully resolved at the summary judgment stage, the pending motions in limine to exclude certain evidence or arguments at trial, see Dkts. 142, 159, 160, are DENIED as moot.
IT IS SO ORDERED.
ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION AND GRANTING DICKSTEIN SHAPIRO LLP'S MOTION FOR ATTORNEYS' FEES [187][190][204]
On March 13, 2019, the Court granted summary judgment in part for Scottsdale *834 and granted summary judgment in part for Underwriters. See Dkt. 178 (the "SJ Order").[1] The Court entered judgment in this action, concluding that (1) the Primary Policy was exhausted by the SFA Settlement Agreement, (2) the First Excess Policy was eroded by the SFA Settlement Agreement in an amount of $4,501,454, (3) the First Excess Policy is the operative policy for Dickstein's defense in a pending action in New York state court, and (4) Underwriters are not entitled to any contribution from Scottsdale for the amount of the SFA Settlement Agreement paid from the First Excess Policy, thus denying Underwriters' claim for equitable contribution. Dkt. 183 at 3-4. The judgment also designated Dickstein as a prevailing party as to Scottsdale. Id. at 4.
On April 17, 2019, Dickstein filed a motion for attorneys' fees against Scottsdale pursuant to the judgment entered by the Court. Dkt. 187. On April 19, 2019, Scottsdale filed a motion for reconsideration, requesting that the Court revisit its prior holdings in the SJ Order. Dkt. 190. The Court will address each of these motions below.
I. Scottsdale's Motion for Reconsideration
A. Legal Standards
1. Rule 59(e)
Rule 59(e) authorizes a party to file a motion to alter or amend a judgment within 28 days after the entry of judgment. "A motion for reconsideration under Rule 59(e) 'should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.' " McDowell v. Calderon , 197 F.3d 1253, 1255 (9th Cir. 1999) (emphasis removed) (quoting another source); see also Zimmerman v. City of Oakland , 255 F.3d 734, 740 (9th Cir. 2001) (noting that the "clear error" prong also includes a decision by the district court that was "manifestly unjust"). It is therefore axiomatic that a Rule 59(e) motion "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." Carroll v. Nakatani , 342 F.3d 934, 945 (9th Cir. 2003) (citation omitted). And certainly, a Rule 59(e) motion "should not be used to ask the court to rethink matters already decided." Citizens for Better Forestry v. U.S. Dep't of Agric. , Nos. C 05-1144 PJH, 2007 WL 1970096, at *1 (N.D. Cal. July 3, 2007) (citation omitted).
A district court has "considerable discretion" to grant or deny a motion to amend a judgment under Rule 59(e). Allstate Ins. Co. v. Herron , 634 F.3d 1101, 1111 (9th Cir. 2011) (quoting McDowell , 197 F.3d at 1255 n. 1 ).
2. Rule 60(b)
Similar to Rule 59(e), a motion may be brought under Rule 60(b) to relieve a party from a final judgment, order or proceedings on "just terms." Fed. R. Civ. P. 60(b). The enumerated reasons for relief under Rule 60(b) are the following:
(1) mistake, inadvertence, surprise, or excusable neglect;
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
*835 (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.
Id.
Scottsdale's motion cites to both Rule 60(b)(1) and the "catchall" category of Rule 60(b)(6). See Dkt. 190 at 9. Under Rule 60(b)(1), a court may issue relief not only for errors committed by any of the parties but also errors made by judicial officers. See Inland Concrete Enters., Inc. v. Kraft , 318 F.R.D. 383, 411 (C.D. Cal. 2016) (citation omitted). However, Scottsdale does not argue about the existence of mistake, inadvertence, surprise, or excusable neglect by any of the parties or by the Court which caused an erroneous judgment to issue. Therefore, the Court will disregard Rule 60(b)(1) in the present analysis and will instead construe Scottsdale's reliance on Rule 60(b) as pertaining only to Rule 60(b)(6).
Under Rule 60(b)(6), in turn, courts have "broad authority" to grant relief from judgment under Rule 60(b)(6), but the Supreme Court has cautioned that the rule should be applied only in "extraordinary circumstances." Liljeberg v. Health Servs. Acquisition Corp. , 486 U.S. 847, 863-64, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) ; see also United States v. Alpine Land & Reservoir Co. , 984 F.2d 1047, 1049 (9th Cir. 1993) (" Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice. The rule is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment."). The notion of "extraordinary circumstances" contemplates that the moving party must show "both injury and that circumstances beyond its control prevented timely action to protect its interests." Alpine Land & Reservoir , 984 F.2d at 1049.
"A district court's grant of relief from judgment under [ Rule 60(b) ] is reviewed for abuse of discretion." Hall v. Haws , 861 F.3d 977, 984 (9th Cir. 2017) (citation omitted). The court abuses its discretion in response to a Rule 60(b) motion "if it does not apply the correct law or if it rests its decision on a clearly erroneous finding of material fact." Casey v. Albertson's Inc. , 362 F.3d 1254, 1257 (9th Cir. 2004) (citation omitted).
3. Local Rule 7-18
Under Local Rule 7-18, a motion for reconsideration may be made
only on the grounds of (a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.
L.R. 7-18 (emphasis added). Importantly, "[n]o motion for reconsideration shall in any manner repeat any oral or written argument made in support of or in opposition to the original motion." Id.
The grounds for reconsideration specified in Local Rule 7-18 are the exclusive grounds for reconsideration in the Central District of California. See, e.g. , *836 Reese v. Verizon Cal., Inc. , No. CV 11-01934 SJO (JEMx), 2011 WL 13193419, at *1-2 (C.D. Cal. Sept. 21, 2011) ("The Local Rules place additional limitations on motions for reconsideration.... Here Plaintiff fails to demonstrate that reconsideration is appropriate under any grounds set forth in Local Rule 7-18... Instead, Plaintiff's Motion for Reconsideration is based on disagreement with the Court's Order. A disagreement with a judgment is not a proper ground for seeking reconsideration pursuant to Local Rule 7-18(a)."); Karol W. Corp. v. Smith News Co. Inc. , No. CV 12-07695 BRO (VBKx), 2014 WL 12586417, at *2-5 (C.D. Cal. Feb. 28, 2014) (applying the "restrictions of Local Rule 7-18 in deciding Defendant's Motion for Reconsideration" and denying the motion on the ground that Defendant "failed to satisfy the requirements of Local Rule 7-18"); Ketab Corp. v. Mesriani Law Grp. , No. 2:14-cv-07241-RSWL (MRW), 2015 WL 2084469, at *2 n. 3 (C.D. Cal. May 5, 2015) ("Plaintiff, who moves pursuant to Local Rule 7-18, is limited to the grounds permitted by Local Rule 7-18."); DealerTrack, Inc. v. Huber , No. CV 06-2335 AG (FMOx), 2008 WL 11337698, at *1-2 (C.D. Cal. Nov. 17, 2008) ; Aventis Pharms S A v. Amphastar Pharms., Inc. , No. ED CV 03-887 RT (SGLx), 2005 WL 5957795, at *1-2 (C.D. Cal. Mar. 25, 2005) ; Dairy Emps. Union Local No. 17 Christian Labor Ass'n of the U.S. Pension Trust v. Ferreira Dairy , No. 5:14-cv-01295-RSWL-MAN, 2015 WL 1952308, at *1-2 (C.D. Cal. Apr. 28, 2015).
In addition, as noted above, a motion for reconsideration "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." Carroll , 342 F.3d at 945. Similarly, "[i]n asking for a motion for reconsideration, a party may not merely urge the court to reconsider past arguments or present new arguments it failed to make prior to the issue of an order." Sewchez Int'l Ltd. v. CIT Grp./Commercial Servs., Inc. , No. CV 07-1211 SVW (JWJx), 2008 WL 11337382, at *2 (C.D. Cal. June 3, 2008).
B. Analysis
Scottsdale brings two distinct challenges to the Court's Order on summary judgment, each of which is addressed separately below.
1. Applicable Policy Period
First, Scottsdale argues that the Court erred by dismissing Scottsdale's argument that the Hettrick Malpractice Action did not even fall within the policy period under the Primary Policy, because Scottsdale collected evidence that Clyde Hettrick had received notice of the Hettrick Malpractice Action in the reporting period for the previous policy year. Scottsdale raised this argument during the briefing on summary judgment, see Dkt. 138 at 24-25, and the Court addressed Scottsdale's argument in the SJ Order by noting that "Scottsdale's argument that there are disputed facts regarding which policy period is even at issue ... is irrelevant because such a question is immaterial to the specific legal issues to be resolved in this action." SJ Order at 13.
Scottsdale's argument about the policy period is simply a rehashing of an argument made and rejected at the summary judgment stage, argument which the Court rejected as immaterial. Indeed, Scottsdale's arguments on the policy period issue were irrelevant to the scope of Scottsdale's claims for declaratory relief set forth in the First Amended Complaint, which were the only claims at issue in the SJ Order after the Court denied Scottsdale's motion for leave to file an amended complaint after briefing on summary judgment had already begun. See Dkt. 155. Thus, Scottsdale impermissibly has used a motion for reconsideration to relitigate an issue previously raised in the litigation, contrary to *837 the purposes of motions for reconsideration filed pursuant to Rule 59(e), Rule 60(b), and Local Rule 7-18. Nothing about Scottsdale's position in the motion for reconsideration provides grounds for the Court to alter its prior ruling under the binding rules governing motions for reconsideration.
Putting aside the procedural bases for denying Scottsdale's motion for reconsideration, the Court finds it prudent to address Scottsdale's substantive argument in greater detail. Specifically, whether the Hettrick Malpractice Action actually constituted a claim made during the policy period of the Primary Policy is ultimately irrelevant to Scottsdale's claims for declaratory relief because the subscribers to the Primary Policy agreed to pay a portion of the SFA Settlement Agreement out of the Primary Policy. As the Court noted in the SJ Order, "Scottsdale may be displeased with Underwriters' decision to allocate the SFA Settlement Agreement to exhaust the Primary Policy limit, but as the excess insurer, Scottsdale has no independent right to veto a reasonable settlement decision made by the primary insurer." SJ Order at 21 (citing Diamond Heights Homeowners Ass'n v. Nat'l Am. Ins. Co. , 227 Cal. App. 3d 563, 580, 277 Cal.Rptr. 906 (1991) ). This is because primary insurers owe no duty of good faith to excess insurers on the same liability, absent a direct contractual relationship between the two levels of insurers. See Fireman's Fund Ins. Co. v. Md. Cas. Co. , 21 Cal. App. 4th 1586, 1600, 26 Cal.Rptr.2d 762 (1994) ; Commercial Union Assurance Cos. v. Safeway Stores, Inc. , 26 Cal. 3d 912, 918, 164 Cal.Rptr. 709, 610 P.2d 1038 (1980).
Even if Underwriters had contemporaneously possessed the same evidence relied upon by Scottsdale calling into question whether the claim was actually made within the policy period for the Primary Policy, Underwriters' decision to exhaust the Primary Policy to pay the SFA Settlement Agreement constitutes a reasonable settlement decision which Scottsdale cannot challenge in this action. None of the evidence cited by Scottsdale affirmatively mandates that the Hettrick Malpractice Action be treated as a claim falling within the policy period for the prior year's insurance policy; Underwriters avoided any legal dispute over that fact by paying the Primary Policy limits, rather than the prior year's policy limits, to satisfy the SFA Settlement Agreement. Thus, regardless of whether Underwriters knew at the time of the SFA Settlement Agreement that Hettrick may have received actual notice of the Hettrick Malpractice Action prior to the inception of the policy period for the Primary Policy, Underwriters' decision to pay the SFA Settlement Agreement out of the Primary Policy was a settlement decision which neither Scottsdale, nor the Court, can upset in this action for declaratory relief.[2]
*838 Analyzing Scottsdale's argument in this light, it is clear that Scottsdale is attempting to litigate around the provision in the First Excess Policy that triggers the First Excess Policy when the Primary Policy insurers "have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses." Dkt. 80-2 at 5. As the Court explicitly held in the SJ Order, this clause requires only that Underwriters actually paid the full $15 million policy limit of the Primary Policy for the First Excess Policy to become operable. SJ Order at 23. Because Underwriters paid the limit of the Primary Policy to satisfy a portion of the SFA Settlement Agreement, and because Scottsdale cannot upset a reasonable settlement decision made by Underwriters in their capacity as subscribers to the Primary Policy, nothing more is required for the Court to conclude that the First Excess Policy attaches as the operative insurance policy moving forward. Scottsdale's argument about the policy period does not affect such a ruling whatsoever, because Underwriters still made the decision to pay the limit of the Primary Policy, a decision which Scottsdale cannot challenge in this action.
2. Allocation of the SFA Settlement Agreement
Second, Scottsdale argues that the Court should reconsider its ruling on the allocation of the SFA Settlement Agreement, in that the Court should have found that none of the money paid by Underwriters pursuant to the SFA Settlement Agreement could be applied to the Primary Policy in light of the collusive nature of Underwriters' internal allocation negotiations. Again, this argument constitutes a rehashing of arguments previously considered and rejected in the SJ Order, and Scottsdale has not identified a legitimate ground for reconsideration of the Court's conclusion about allocation under the applicable rules above. Although Scottsdale argues that the Court "significantly misunderstood" what Scottsdale was arguing, Dkt. 206 at 9, that is simply not true; the Court fully understood that Scottsdale sought a ruling that the entire amount of the SFA settlement should be allocated to Underwriters' extra-contractual liability, but the Court found such a holding to be inappropriate given that Scottsdale could not upset the reasonable settlement decision made by the Primary Policy subscribers to exhaust the Primary Policy. Ultimately, Scottsdale simply disagrees with the Court's application of law, and therefore Scottsdale's request for reconsideration of this issue is procedurally improper.
To address the substance of Scottsdale's argument, the deficiency in Scottsdale's position is that Scottsdale seeks a holding that the allocation of the SFA Settlement Agreement was collusive across both the primary and excess layers of insurance coverage. To repeat yet again, Scottsdale has no basis in this action to challenge a reasonable settlement decision by the subscribers to the Primary Policy to allocate a portion of the SFA Settlement Agreement to exhaust the Primary Policy. See SJ Order at 21 ("[A]s the excess insurer, Scottsdale has no independent right to veto a reasonable settlement decision made by the primary insurer.") (citing Diamond Heights , 227 Cal. App. 3d at 580, 277 Cal.Rptr. 906 ).
The Court's conclusion that Underwriters negotiated a collusive settlement only applied to the allocation of the SFA Settlement Agreement to the First Excess Policy *839 as relevant to Underwriters' cross-claim against Scottsdale for equitable contribution, in light of the fact that Scottsdale was not part of those allocation negotiations. But even if Scottsdale had participated in the negotiations, Scottsdale still would have had no power to affect Underwriters' decision to allocate a portion of the SFA Settlement Agreement to the Primary Policy. Thus, the allocation that is "most advantageous" to Scottsdale, the non-settling party, could only be one that does not require Scottsdale to make a contribution at its own level of subscription under the First Excess Policy and cannot be one that upsets the reasonable settlement decision of the subscribers under the Primary Policy. See Dillingham Constr., N.A., Inc. v. Nadel P'ship, Inc. , 64 Cal. App. 4th 264, 287, 75 Cal.Rptr.2d 207 (1998) ("The cases indicate that where the settling parties have failed to allocate, the trial court must allocate in the manner which is most advantageous to the nonsettling party."). The Court explained as much in the SJ Order. See SJ Order at 36 (noting that "to allocate the SFA settlement most advantageously to Scottsdale, then the entirety of the SFA settlement would be allocated to Underwriters' extra-contractual liability," but holding that "[t]he Court does not make such a finding for purposes of the parties' respective claims for declaratory relief, because, as explained above, there is no basis in the law for such a conclusion " since it would upset Underwriters' reasonable settlement decision under the Primary Policy) (emphasis added).
Scottsdale has not articulated why the Court's conclusion in this regard was legally incorrect, which in any event would not be an appropriate basis for a motion for reconsideration and instead is more appropriately raised on appeal. Therefore, Scottsdale is not entitled to any relief in connection with its motion for reconsideration.
3. Summary
In conclusion, Scottsdale has not identified a legitimate basis for the Court to revisit the determinations reached in the SJ Order. Therefore, the Court DENIES Scottsdale's motion for reconsideration in its entirety.
II. Dickstein's Motion for Attorneys' Fees
Turning to Dickstein's motion for attorneys' fees against Scottsdale, the primary point of disagreement between Dickstein and Scottsdale is whether California law or New York law should apply to Dickstein's fee request.
A. Choice of Law
In a federal action brought under diversity jurisdiction, the district court "appl[ies] the substantive law of the forum in which the court is located, including the forum's choice of law rules." First Intercontinental Bank v. Ahn , 798 F.3d 1149, 1153 (9th Cir. 2015) (internal quotation marks and citation omitted). Thus, the Court applies California's choice of law rules.
California courts will generally apply California law "unless a party litigant timely invokes the law of a foreign state." Hurtado v. Superior Court , 11 Cal. 3d 574, 581, 114 Cal.Rptr. 106, 522 P.2d 666 (1974).[3] The party invoking the law of *840 a foreign state bears the burden to "demonstrate that the [foreign] rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." Hurtado , 11 Cal. 3d at 581, 114 Cal.Rptr. 106, 522 P.2d 666 (citations omitted). Dickstein has invoked the application of New York law to its motion for attorneys' fees, so Dickstein bears the burden to demonstrate that New York law is appropriately applied to its fee request.
California courts apply several different tests to a choice-of-law issue regarding a contract dispute. See Arno v. Club Med Inc. , 22 F.3d 1464, 1468 n. 6 (9th Cir. 1994) (collecting cases that reflect "some difference of opinion" regarding the appropriate test to use for a California choice of law rule for contracts). These tests include a statutory test under California Civil Code § 1646, which provides that "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made." However, courts have suggested that § 1646 is limited to matters of contract interpretation. See Frontier Oil Corp. v. RLI Ins. Co. , 153 Cal. App. 4th 1436, 1459, 63 Cal.Rptr.3d 816 (2007), modified (Sept. 5, 2007) (holding that "the choice-of-law rule in Civil Code section 1646 determines the law governing the interpretation of a contract"). The second test, which is to be used for choice-of-law issues other than contract interpretation, is called the "governmental interest" test. Id. at 1459-60, 63 Cal.Rptr.3d 816 ; see also Rutherford v. FIA Card Servs., N.A. , No. CV 11-04433 DDP (MANx), 2012 WL 5830081, at *3 (C.D. Cal. Nov. 16, 2012) (labeling Frontier 's holding limiting § 1646 to matters of contract interpretation as the "modern approach" in California). Dickstein's fee request does not depend on contract interpretation, so § 1646 is inapplicable, and the Court will analyze the choice of law issue under the governmental interest test. See Frontier Oil , 153 Cal. App. 4th at 1460, 63 Cal.Rptr.3d 816 (applying the governmental interest analysis because "[t]he choice-of-law issue concerned the right to recover attorney fees in an action to enforce the insured's rights under the policy and did not involve an issue of contract interpretation").[4]
*841 The governmental interest analysis involves three steps: (1) the court first "determines whether the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question is the same or different;" (2) if the two sets of law are materially different, "the court examines each jurisdiction's interest in the application of its own law under the circumstances of the particular case to determine whether a true conflict exists;" (3) if there is a true conflict, the court "carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law 'to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state' ... and then ultimately applies 'the law of the state whose interest would be the more impaired if its law were not applied.' " Kearney v. Salomon Smith Barney, Inc. , 39 Cal. 4th 95, 107-08, 45 Cal.Rptr.3d 730, 137 P.3d 914 (2006) (citation omitted).
1. Material Difference Between California and New York Law
Here, under the first step, the parties agree that application of California law or New York law would produce materially different results. See Wash. Mut. Bank, FA v. Superior Court , 24 Cal. 4th 906, 919, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (2001) (noting that the foreign law must be "materially different" to satisfy the first step of the governmental interest test). Under California law, an insured may only recover attorneys' fees if the insurer's conduct in withholding benefits or coverage under the policy issued to the insured was unreasonable and therefore in bad faith. See Brandt v. Superior Court , 37 Cal. 3d 813, 819, 210 Cal.Rptr. 211, 693 P.2d 796 (1985). New York law maintains a general rule that an insured cannot recover attorneys' fees from its insured, but allows an award of attorneys' fees to an insurer that " 'has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations' " and succeeds in its defense. Liberty Surplus Ins. Corp. v. Segal Co. , 420 F.3d 65, 67 (2d Cir. 2005) (quoting Mighty Midgets, Inc. v. Centennial Ins. Co. , 47 N.Y.2d 12, 21, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979) ). The Second Circuit subsequently clarified that the litigation must pertain to a "dispute over the insurer's duty to defend" in order for fees to be awardable to the insured. Id. (citing Emp'rs Mut. Cas. Co. v. Key Pharms. , 75 F.3d 815, 824 (2d Cir. 1996) (per curiam)).
The parties acknowledge that Scottsdale refused to tender a defense to Dickstein in the Muhs Action proceeding in New York and subsequently filed the instant action, naming Dickstein as a defendant and seeking declaratory relief that Scottsdale is not obligated to defend Dickstein in the Muhs Action. See Dkt. 14 ¶¶ 52-59 (Scottsdale bringing a second cause of action that requests a judicial determination that Scottsdale is not obligated to defend Dickstein under the First Excess Policy). Thus, Dickstein was cast in a defensive posture by Scottsdale and may rightfully recover attorneys' fees from Scottsdale in connection with this action, if New York law were to apply. On the other hand, both parties seem to acknowledge that there is no basis to find that Scottsdale's refusal to tender a defense to Dickstein in the Muhs Action-and Scottsdale's action for declaratory relief before this Court-was unreasonable or in bad faith, and the Court similarly finds no basis to conclude as much. Therefore, attorneys' fees would not be available to Dickstein under California law, and there is a material difference between New York and California law as applied to Dickstein's fee request.
*842 2. A True Conflict Exists Between California and New York Law
Under the second step of the governmental interest analysis, the Court must determine "what interest, if any, each state has in having its own law applied to the case." Id. at 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (citing Hurtado , 11 Cal. 3d at 580, 114 Cal.Rptr. 106, 522 P.2d 666 ). "As the forum state, California has an interest in applying its law to this case." Costco Wholesale Corp. v. Liberty Mut. Ins. Co. , 472 F. Supp. 2d 1183, 1201 (S.D. Cal. 2007) (citing Rosenthal v. Fonda , 862 F.2d 1398, 1402 (9th Cir.1988) ). Conversely, "California law acknowledges another state's interest in the application of that state's law where the events giving rise to litigation took place within that state's borders." Id. (citations omitted); see also Offshore Rental Co. v. Cont'l Oil Co. , 22 Cal. 3d 157, 168, 148 Cal.Rptr. 867, 583 P.2d 721 (1978) (finding that Louisiana had an interest in applying its law in a California case because "[t]he accident in question occurred within Louisiana's borders" and noting that "although the law of the place of the wrong is not necessarily the applicable law for all tort actions ... the situs of the injury remains a relevant consideration") (citation omitted).
Based on the procedural posture of the instant action, both California and New York have tangible interests in applying its own laws to Dickstein's fee request. The acts giving rise to this litigation occurred both in California and New York: the underlying malpractice action against Hettrick, the ensuing action by SFA against Underwriters for bad faith, and the ultimate settlement agreement and allocation between the insurance policies occurred in California, while Scottsdale's refusal to tender a defense to Dickstein in the ongoing Muhs Action occurred in New York. But for either of these events, Scottsdale would not have filed suit seeking declaratory relief that it was not obligated to defend Dickstein in the Muhs Action, the only ongoing claim covered by the insurance policies at issue. The practical purpose of Scottsdale bringing this action was to resolve a coverage dispute in New York, and New York certainly has an interest in protecting the rights of its insureds when hailed into court in a foreign jurisdiction to resolve a New York-based coverage dispute. California also has an obvious interest in applying its own laws to insurance disputes involving litigation that occurred within its borders.
Each state also has a tangible interest in the application of its own law to Dickstein's motion for attorneys' fees. New York would have an interest in protecting its insured, and upholding the benefit of what the parties bargained for under the insurance contract, by treating Dickstein's attorneys' fees as a recoverable item of defense costs under the insurance policy. California also has an interest in applying its doctrine on attorneys' fees to protect Scottsdale from paying attorneys' fees for ordinary coverage litigation occurring within its borders, which additionally required determinations as to the legal significance of events that occurred in California, in the absence of any bad faith. Therefore, both California and New York have sufficient interests in applying its own laws under the second step of the governmental interest test.
3. New York's Interests Would Be Comparatively More Impaired
Under the third and final step, called the "comparative impairment" inquiry, the Court must weigh the interests of each jurisdiction in applying its own respective laws to determine which state's interests would be "more impaired" if the *843 state's law were not applied. Wash. Mut. Bank , 24 Cal. 4th at 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (internal quotation marks and citation omitted). As part of the comparative impairment analysis, a district court "must determine 'the relative commitment of the respective states to the laws involved' and consider 'the history and current status of the states' laws' and 'the function and purpose of those laws.' " Id. (quoting Offshore Rental , 22 Cal. 3d at 166, 148 Cal.Rptr. 867, 583 P.2d 721 ). Courts also consider "each jurisdiction's relevant contacts with the parties, property and the incident involved in order to compare the genuine interest of each jurisdiction in having its laws applied." Costco Wholesale , 472 F. Supp. 2d at 1198 (internal quotation marks omitted) (quoting Sierra-Bay Fed. Land Bank Ass'n v. Superior Court , 227 Cal. App. 3d 318, 331, 277 Cal.Rptr. 753 (1991) ).
Both California and New York have longstanding commitments to their respective rules regarding awarding attorneys' fees to successful insureds in certain circumstances, as each doctrine has existed for over 30 years. The Court has received no argument, and sees no basis to find, that one state's "commitment" to its doctrine outweighs the other, or that the "history and current status" of either state's laws merits an inference in favor of either state. Therefore, the only considerations at issue in this analysis are the function and purpose of each state's laws and the relative weight of each state's competing interests in applying those laws.
New York's purpose in awarding fees to a successful insured defending against a dispute over its insurer's duty to defend is to effectuate the notion that "an insurer's responsibility to defend reaches the defense of any actions arising out of the occurrence" leading to litigation against the insured. Mighty Midgets , 47 N.Y.2d at 21, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (emphasis in original); see also U.S. Underwriters Ins. Co. v. City Club Hotel, LLC , 3 N.Y.3d 592, 597-98, 789 N.Y.S.2d 470, 822 N.E.2d 777 (2004) (interpreting the reasoning behind Mighty Midgets as treating the insurer's duty to defend to encompass "a defense against an insurer's declaratory judgment action"). Thus, where an insured must defend itself against its own insurer in any litigation pertaining to the insurer's duty to defend under the insurance policy, New York courts treat that defense as inuring to the insurer's duty to defend the same as any other claim covered under a policy, thereby making an award of attorneys' fees to the successful insured an appropriate measure of relief.
On the other hand, California's rule allows an award of attorneys' fees to a successful insured only if the "insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy," because in that sense the insured's attorneys' fees are considered "an economic loss - damages - proximately caused by the tort." Brandt , 37 Cal. 3d at 817, 210 Cal.Rptr. 211, 693 P.2d 796 (citation omitted). Thus, rather than treating the insured's attorneys' fees incurred in defending a coverage dispute as a theoretical "defense cost" properly allocable to the insurer, California instead more broadly upholds the default rule that each party is to bear its own attorneys' fees, unless those fees were the result of the insurer's bad faith conduct.
Both California and New York allow for exceptions to the rule against awarding attorneys in specific situations meant to protect an innocent insured from actions taken by its insurer to refuse coverage. Thus, the purpose and rationale behind both bodies of law suggest that the collective *844 states' interests would be more impaired if Dickstein, the insured, is not permitted to recover attorneys' fees in this action. If California law were to be applied here, a New York insured would not be getting a bargained-for benefit under its insurance contract with its insurer. Thus, applying California law here would more greatly impair New York's interests in protecting its insureds in these scenarios, whereas applying New York law would merely carve out an additional exception to California's rule against attorneys' fees and would not as significantly impair California's interests in generally requiring parties to bear their own fees.
Furthermore, the relative contacts to California and New York in this action additionally favor a finding that New York's interests would be more significantly impaired by the application of California law compared to the other way around. While much of the specific events Scottsdale challenges in this action occurred in California, as noted above, the practical purpose of Scottsdale's lawsuit was to establish Scottsdale's obligation to represent Dickstein in the Muhs Action pending in New York. Dickstein was not a party to the Hettrick Malpractice Action or the SFA Action, and Dickstein was not a part of the settlement negotiations and allocation which the Court found to be collusive. The only reason Dickstein is a party to this lawsuit is its status as the insured in the Muhs Action, so New York has a greater interest in upholding Dickstein's rights as an insured under New York law than California does. Indeed, California's interests, when applied specifically to Dickstein's motion for attorneys' fees, are minimal compared to California's interests in applying its substantive insurance law to Scottsdale's causes of action for declaratory relief. These conclusions are true regardless of where the insurance policy between Scottsdale and Dickstein "locates" the subject matter and/or the insured risk of the contract, since Dickstein maintained offices throughout the United States and was afforded coverage against legal malpractice claims in all jurisdictions.
In summary, New York's interests would be comparatively more impaired by the application of California law to Dickstein's motion for attorneys' fees than California's interests would be impaired by the application of New York law. Accordingly, per the governmental interest analysis, the Court applies New York law to Dickstein's fee request. And, as noted above, because Dickstein was cast into a defensive posture in Scottsdale's lawsuit for declaratory relief and was deemed the prevailing party, Dickstein is entitled to attorneys' fees under New York law. See, e.g. , U.S. Underwriters Ins. , 3 N.Y.3d at 598, 789 N.Y.S.2d 470, 822 N.E.2d 777 (holding that "under Mighty Midgets , an insured who prevails in an action brought by an insurance company seeking a declaratory judgment that it has no duty to defend or indemnify the insured may recover attorneys' fees regardless of whether the insurer provided a defense to the insured"); Hervochon v. Iona College , No. 14 Civ. 6017 (CS) (PED), 2019 WL 2451431, at *8 (S.D.N.Y. Feb. 15, 2019) (holding that an insurer was obligated to pay for its insured's attorneys' fees in connection with the insured's fourth-party complaint filed against the insurer after the insurer "took the initial legal step" of filing a declaratory judgment action against the insured in an "attempt to avoid its policy obligations").
B. Reasonableness of Fees
The parties do not properly address how the Court should assess Dickstein's specific fees requested in its motion for reasonableness. Despite arguing that New York law should apply, Dickstein *845 then cites only to California state cases addressing when fees are reasonable. See Dkt. 187 at 18-21. However, on the other hand, Scottsdale makes no argument whatsoever as to whether Dickstein's requested fees are reasonable, focusing solely on the choice of law issue in its opposition. See Dkt. 196. Therefore, the Court construes Scottsdale's opposition as conceding to the reasonableness of the amount of attorneys' fees and expenses Dickstein seeks to recover. In any event, the Court's review of Dickstein's attached evidentiary support, see Dkts. 187-3-187-6, also does not indicate that any portion of Dickstein's fees is unreasonable. Therefore, the Court GRANTS Dickstein's motion for attorneys' fees and awards Dickstein $346,697.50 as reasonable attorneys' fees.
III. Conclusion
For the reasons set forth above, the Court DENIES Scottsdale's motion for reconsideration, and the Court GRANTS Dickstein's motion for attorneys' fees and awards Dickstein $346,697.50 as reasonable attorneys' fees.
IT IS SO ORDERED.

The Court GRANTS Underwriters' Request for Judicial Notice, Dkt. 78, and Scottsdale's Request for Judicial Notice, Dkt. 94, for all documents attached to or referenced in the requests that are cited in this Order. The documents are publicly available and not subject to reasonable dispute, and the opposing party has not challenged the authenticity of those documents. See Fed. R. Evid. 201. For all documents in the parties' respective Requests for Judicial Notice that are not cited in this Order, the Court finds those documents to be irrelevant or unnecessary to the issues to be decided, and therefore the Court DENIES as moot the requests to take judicial notice of those documents.

Scottsdale was not named as a separate defendant in the SFA Action but was lumped into the defined term "London Market Companies," which also included Lexington and Swiss Re. See Dkt. 93-7 ¶ 10.

Equitable subrogation would require Scottsdale to show that the insured party-here, Hettrick and/or Dickstein-has an "existing, assignable cause of action" that the insured "could have asserted for his own benefit had he not been compensated for his loss by the insurer." Troost v. Estate of DeBoer , 155 Cal. App. 3d 289, 294, 202 Cal.Rptr. 47 (1984). In the SFA Settlement Agreement, SFA as the assignee of all of Hettrick's claims against Underwriters released all such claims, including the claims for bad faith denial of defense coverage to Hettrick. Thus, Hettrick and Hettrick's assignee no longer maintain any existing, assignable causes of action for insurance bad faith against Underwriters. Scottsdale's only avenue for equitable subrogation would be through Dickstein for Underwriters' bad faith in allocating the SFA Action, but it is unclear whether and to what extent Scottsdale may be able to do so, particularly in light of the fact that Dickstein apparently has not objected to the settlement allocation reached by Underwriters. Dickstein, for its part, has taken the position in this litigation that it reserves all contractual rights under its malpractice insurance policies as to any claim or defense that could be asserted by Dickstein, Dkt. 104 at 11-12, allowing for the possibility that Scottsdale could maintain an equitable subrogation claim via Dickstein against Underwriters in some respect. In any event, Scottsdale admits that it is not attempting in this litigation to assert a claim against Underwriters based on a theory of equitable subrogation. See Dkt. 138 at 17 (Scottsdale stating in opposition to Underwriters' motion for summary judgment that "[n]or is Scottsdale asserting an equitable subrogation claim").

Both the Primary Policy and the First Excess Policy state that disputes concerning the interpretation of the policy are governed by the laws of the District of Columbia. See Dkt. 80-1 at 1; Dkt. 80-2 at 2. However, throughout the briefing in this case, all parties cite to California law in arguing the interpretation of the policy language under the insurance policies and in addressing the legal significance of the SFA Settlement Agreement. Accordingly, the Court construes the parties' arguments as conceding that California law governs the issues the Court must resolve for purposes of this litigation, notwithstanding the choice of law provisions in the insurance policies at issue.

Again, Scottsdale does not assert a claim against Underwriters based on a theory of equitable subrogation in this litigation. See Dkt. 138 at 17 (Scottsdale stating in opposition to Underwriters' motion for summary judgment that "[n]or is Scottsdale asserting an equitable subrogation claim"). Scottsdale's acknowledgement that it is not seeking to bring a bad faith claim against Underwriters via equitable subrogation means that the question of whether and to what extent Underwriters actually acted in bad faith in denying defense coverage to Hettrick, or whether Underwriters acted in bad faith by allocating the settlement sum of the SFA Action to exhaust Dickstein's coverage under the Primary Policy, is not at issue in this litigation.

Scottsdale's argument that it does not share the same level of obligation as Underwriters misapplies the theory of equitable contribution. Scottsdale presumes that Underwriters seek equitable contribution for the settlement payments allocated to the Primary Policy as well as the First Excess Policy. Underwriters does not seek equitable contribution from Scottsdale as a primary carrier, but merely in Underwriters' capacity as an excess carrier and only to the portion of the settlement attributed to the First Excess Policy, the first excess layer of coverage to which both Scottsdale and Underwriters subscribe.

As an aside, Scottsdale argues that Underwriters' allocation of the SFA settlement needed to be included in the SFA Settlement Agreement itself. Case law does not support Scottsdale's position, as courts routinely look outside the settlement agreement itself, including to testimony of attorneys involved in the settlement negotiations, to determine whether an allocation of the settlement sum was actually made. See, e.g. , Dillingham , 64 Cal. App. 4th at 285-86, 75 Cal.Rptr.2d 207 (considering testimony from attorneys involved in underlying settlement and ultimately finding that testimony insufficient to establish that an allocation occurred or, alternatively, that any such allocation was collusive); Res-Care , 2011 WL 3353893, at *17 (considering a written demand letter and testimony from an expert witness as evidence supporting allocation of a settlement, further noting that "Dillingham did not require that the testimony of counsel [involved in settlement negotiations] be disregarded"); MGA Entm't , 2012 WL 628203, at *5 (considering and rejecting "self-serving" statements that a settlement included payment for a bad faith claim despite no statement in the settlement agreement to that effect); Essex Ins. Co. v. Heck , 186 Cal. App. 4th 1513, 1524, 112 Cal.Rptr.3d 915 (2010) ("Because it is impossible to tell from the settlement agreement whether payment was made on behalf of an insured ... in order for Essex to prove that it compensated an insured for [ ] personal injury damages and the amount of such compensation, Essex necessarily must resort to evidence outside the settlement agreement.").

The parties have not informed the Court whether there was already a good faith determination regarding the SFA Settlement Agreement in the SFA Action or other proceedings.

The Court uses the same defined terms in this Order as used in the SJ Order. See Dkt. 178.

Perhaps in the abstract Scottsdale would theoretically be able to bring an unusual subrogation claim against Underwriters for bad faith, in that Underwriters wrongfully attributed the SFA Settlement Agreement to the Primary Policy instead of the insurance policy operating in the prior year. It is unclear to the Court whether such a claim would be viable, but it certainly would fall within the confines of the only relief available to Scottsdale as previously identified by the Court: "Scottsdale would only be entitled to pursue relief against the primary insurers through a theory of equitable subrogation, on the ground that the primary insurers breached the covenant of good faith and fair dealing owed to the insureds by improperly allocating the SFA settlement amount toward the policies." SJ Order at 21. But as the Court also noted in the SJ Order, SFA released all assignable claims against Underwriters as part of the SFA Settlement Agreement, and accordingly Scottsdale acknowledged in its briefing that it was not attempting to assert an equitable subrogation claim against Underwriters in this action. See id. at 14-15 n. 3; Dkt. 138 at 17 (Scottsdale stating in opposition to Underwriters' motion for summary judgment that "[n]or is Scottsdale asserting an equitable subrogation claim").

The Court rejects Scottsdale's argument, brought without any legal support, that Dickstein did not raise its request for New York law in a timely manner by failing to raise its desire to apply New York law earlier in this litigation. As Dickstein correctly notes, "a separate conflict of laws inquiry must be made with respect to each issue in the case." Wash. Mut. Bank, FA v. Superior Court , 24 Cal. 4th 906, 920, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (2001) (citations omitted); see also Fireman's Fund Ins. Co. v. Nationwide Mut. Fire Ins. Co. , No. 11cv114-IEG(DHB), 2012 WL 1985316, at *5 (S.D. Cal. June 4, 2012) (citing Washington Mutual Bank and conducting a separate conflict-of-laws analysis for the discrete issues of whether a party was an additional insured under an insurance policy and whether the insurer had a duty to defend the party in separate proceedings). Dickstein's invocation of a choice of law issue is wholly independent from any of the legal issues resolved at summary judgment as part of Scottsdale's claims for declaratory relief and Underwriters' claim against Scottsdale for equitable contribution.

Courts also apply a third test when a contractual agreement contains a choice of law provision, in which the court applies the parties' chosen law if "the chosen state has a substantial relationship to the parties or their transaction" or if "there is any other reasonable basis for the parties' choice of law." Nedlloyd Lines B.V. v. Superior Court , 3 Cal. 4th 459, 466, 11 Cal.Rptr.2d 330, 834 P.2d 1148 (1992) (citing Restatement (Second) of Conflict of Laws § 187(2) ). As the Court noted in the SJ Order, both the Primary Policy and the First Excess Policy contain a choice-of-law provision applying District of Columbia law to questions of policy interpretation. See Dkt. 80-1 at 1 ("Any dispute concerning the interpretation of this [Primary] Policy shall be governed by the laws of the District of Columbia."); Dkt. 80-2 at 2 (same). Dickstein's fee request does not depend on an interpretation of either insurance policy, and in any event neither Dickstein nor Scottsdale seeks to invoke District of Columbia law as applicable to Dickstein's fee request. Therefore, the Court will not consider whether District of Columbia law should be applied here.